**CONSOLIDATED ALUMINUM CORPORATION**

v.

**C.F. BEAN CORPORATION, et al.**

**Civ. A. No. 81–0500.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

July 16, 1986.

Robert W. Winson, Robert W. Doty, Howard D. Schwartz, Eckert, Seamans, Cherin, & Mellott, Pittsburgh, Pa., A. Lane Plauche, Plauche, Smith & Nieset, Lake Charles, La., for plaintiff.

Allen F. Campbell, Deutsch, Kerrigan & Stiles, New Orleans, La., for C.F. Bean Corp. and Bean Dredging Corp.

Edgar F. Barnett, Woodley, Barnett, Williams & Fenet, Lake Charles, La., for Highlands Ins. Co.

Mat M. Gray, III, Faris, Ellis, Cutrone & Gilmore, New Orleans, La., for St. Paul Fire & Marine Ins., Inc.

S. Gene Fendler, Suzanne Dittmer, Liskow & Lewis, New Orleans, La., for Texaco, Inc.

Richard N. Dicharry, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Arkwright-Boston Mfgs. Mut. Marine Ins. Co.

Alan Van Emmerik, David V. Hutchinson, U.S. Dept. of Justice, Torts Branch, Civ. Div., Washington, D.C., for U.S., third party defendants.

## OPINION

VERON, District Judge.

Plaintiff, Consolidated Aluminum Corporation (hereinafter referred to as Consolidated) filed suit seeking lost profits and damages allegedly sustained by its aluminum manufacturing plant located south of Lake Charles, Louisiana. The alleged damages occurred when the natural gas supply to the plant was shut off due to a dredging barge breaking the pipeline which supplied the natural gas. Named as defendants were: C.F. Bean Corporation and Bean Dredging Corporation (hereinafter collectively referred to as Bean), the owners/operators of the dredge; Bean's insurers; and, Texaco, Inc. (hereinafter referred to as Texaco), the owners of the pipeline. Texaco subsequently filed a third-party claim against the United States through the United States Army Corps of Engineers (hereinafter referred to as Corps of Engineers), as the party with primary responsibility for the dredging operations, tendering the Corps of Engineers to Consolidated as a direct defendant. Additionally Texaco has asserted a cross-claim against Bean for the cost of repairing its pipeline and the value of the natural gas lost due to the rupture of the pipeline by Bean. Texaco also seeks indemnification or contribution from Bean for any amount it might be required to pay to Consolidated.

Texaco has filed a claim against the United States through the Corps of Engineers contending that the Corps of Engineers is liable for Bean's actions because it failed to properly supervise and control Bean's activities, and that the Corps of Engineers is independently liable because it failed to select a competent contractor to dredge the Calcasieu River Ship Channel. Bean has filed a cross-claim against Texaco, seeking indemnification or contribution in any amount for which it may be cast.

This Court acting upon Bean's motion for summary judgment originally granted that summary judgment as to Bean on the grounds that, under *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), no cause of action exists in tort for negligent interference with contract.[1] The United States Fifth Circuit Court of Appeals, 772 F.2d 1217, reversed the summary judgment and remanded, finding that "the bright line" rule of *Robins Dry Dock* did not apply in the instant case and stating that the plaintiff's claim of negligence should be analyzed under tort principles applied by this Court in admiralty.

The issues of liability and quantum of damages have been bifurcated with the latter being reserved for resolution at a future date.

On remand, after hearing the testimony, reviewing the stipulations and pleadings, and weighing all of the evidence presented at trial on the merits, the Court makes the following:

## FINDINGS OF FACT

### 1.

Consolidated is and was at all pertinent times a New York corporation doing business within this District. Bean (collectively) is and was at all pertinent times a Louisiana corporation. Texaco is and was at all pertinent times a Delaware corporation doing business within this District. The United States is and was at all perti-

---

1. Final judgment under Fed.R.Civ.P. 54 was entered and all further proceedings in the case were stayed pending outcome of appeal to the Fifth Circuit.

nent times a sovereign nation as to which venue properly lies within this District.

### 2.

In 1963, Texaco laid a natural gas pipeline in order to provide natural gas service to one customer, PPG Industries, Inc. This pipeline consisted of two segments: a six-inch line known as the "Big Lake Line" or the "Hackberry Line," running from the Hackberry area south of Lake Charles, Louisiana to a valve manifold known as "Point C"; and, a twelve-inch line known as the "PPG Lateral," running from Point C to the PPG plant located across the Calcasieu River.

The Corps of Engineers issued a permit (no. LMNOD (Calcasieu River) 287) to Texaco allowing Texaco to construct the twelve-inch pipeline across the Calcasieu River at Mile 31.9 Station No. 1683 + 90. The permit set forth the guidelines to be followed in laying and maintaining the pipeline crossing. The permit additionally provided in Clause (g), as one of the conditions for issuance:

> That the United States shall in no case be liable for any damage or injury to the structure or work herein authorized, which may be caused by or result from future operations undertaken by the Government for the conservation or improvement of navigation or for other purposes and no claim or right to compensation shall accrue from any such damage.

That pipeline was laid and maintained in accordance with the requirements of the Corps of Engineers permit.

### 4.

In 1965, Texaco connected an unused sixteen-inch production line, known as the "Evangeline Pipeline," to the PPG lateral. Natural gas was then transported through the Evangeline Pipeline.

### 5.

By contract dated September 20, 1968, a Gas Sales and Purchase Contract was executed between Texaco and Consolidated's predecessor in interest, Gulf Coast Aluminum Corporation. In accordance therewith, a pipeline was laid from Point C southward to Consolidated's plant, located south of Lake Charles. The gas contract provided that Consolidated would purchase its plant's requirements, up to a stated maximum, and in any case, not less than a specific quantity of gas, from Texaco.

### 6.

On December 14, 1979, Bean, who at all times held itself out to the public as an expert, independent dredging contractor, entered into Construction Contract No. DACW 29–80–C–0063 with the United States Army Engineer District, New Orleans for maintenance dredging of the Calcasieu River and Pass from Mile 15.5 to Mile 36, along with other areas unimportant to this litigation. For the area surrounding Texaco's pipeline crossing, the contract specifications called for dredging to a minus forty feet MLG (mean low gulf) over a four hundred foot project width of the bottom with one foot allowable overdredging and side slopes of one to three feet.

### 7.

General provision 12 of the contract provides in pertinent part:

> The Contractor shall, without additional expense to the Government, be responsible ... for all damages to persons or property that occur as a result of his fault or negligence. He shall take the proper safety and health precautions to protect the work, the workers, the public and the property of others....

### 8.

And, the technical provisions of the contract provides:

> 1–10.1 The Contractor shall exercise caution when working in the vicinity of structures and utilities crossing or adjacent to the channel or disposal areas. Repair of any damage resulting from excessive or improper excavation in the bottom or side slopes of the channel will be the responsibility of the Contractor. Where dredging to the theoretical section might endanger any structure, the Contracting Officer may reduce the required

excavation in the vicinity of such structure.

1–10.2 The Contractor shall provide at least project dimensions over all utility crossings by whatever approved method the Contractor elects to use. The Contractor shall submit for approval by the Contracting Officer a detailed plan of operation at each pipeline or utility crossing where construction surveys indicated project channel does not exist. The plan shall contain emergency measures to be taken in the event of an accident. The Contractor shall notify the owners of pipelines or utilities at least 3 days prior to operating within 150 feet of a pipeline or utility.

1–10.3 The following structures or utilities are located within the limits of the work. The vertical clearances listed below were furnished by the utility owners at the time permits were issued and are not the result of a survey made by the Government. It will be the responsibility of the Contractor to verify these locations and clearances.

### 9.

The correct location of Texaco's pipeline was provided in the contract as well as Texaco's address.

### 10.

On January 14, 1980, Bean provided the Corps of Engineers with a general plan for safe dredging around and over utility crossings like Texaco's pipeline, which was approved by the Corps of Engineers. Among other things this plan provided that:

The owners of each pipeline and/or utility lines will be contacted at least seven (7) days before by phone and by letter to have a crew come out and mark and verify the elevations of respective lines and give all information to the Dredge Superintendent.... [Bean] will request that a representative be on board the dredge to witness the depths and swing of the dredge.

This plan further provided that the dredge was to advance to within twenty-five feet of the pipeline and then tie off the cutter. This plan reflected the typical and customary practice in the dredging industry.

### 11.

Dredging began on January 14, 1980. On March 24, 1980, Bean added its Dredge No. 32 (the dredge involved in this matter) to the project. The dredge was 202 feet long, 49 feet in width, and contained a 56 foot cutter ladder, to which the cutter was attached. The dredge maintained a crew of approximately 45 men.

### 12.

Mr. Elton McCabe, a project manager for Bean, was in charge of and had overall supervision of Bean's dredges operating pursuant to the dredging contract, including Dredge No. 32.

### 13.

Captain Adolph Pontiff was the Dredge Superintendent of Dredge No. 32 during all pertinent times, and as such, Pontiff supervised and controlled the operation of Dredge No. 32, including all employees aboard the vessel. On board the dredge, he had total authority and discretion in running the dredging operations.

### 14.

Pontiff had only occupied the position of Dredge Superintendent for approximately three months prior to the accident. This was the second dredging project that Pontiff worked on in the capacity of dredge superintendent, and the first of those projects that involved dredging in the vicinity of utility and pipeline crossings. However, Pontiff had worked on dredges for many years in various other capacities.

### 15.

Dredge No. 32 began work above the Texaco pipeline crossing and worked its way down river. The method of dredging employed by Dredge No. 32 was the "box" cut method whereby the dredge dredges beyond the channel limits, controlling the width of the cut by reading degrees of the dredge's swing, thus "feeling for the bank" of the channel.

**16.**

Though this method of dredging may or may not be a proper procedure in areas free of utility crossings, it is contrary to sound and generally accepted dredging practice in areas proximate to utility crossings such as the area around the Texaco pipeline.

**17.**

The sound and generally accepted dredging practice to be employed especially in areas where utility crossings are located is to stake or mark the channel so that the dredge will be able to maintain proper alignment on the centerline of the channel. Buoys, stakes or markers are required in order to mark the centerline and toes (edges) of the channel so that those persons operating the dredge will know how much of a swing to make.

**18.**

Bean, through its Dredge No. 32, failed to follow the standard dredging practice as described in Finding of Fact No. 17.

**19.**

Dredge No. 32 struck and ruptured the Texaco pipeline at approximately 7:00 A.M. on April 5, 1980. The point of rupture was located 34 feet east of the eastern toe of the channel.

**20.**

On the evening before the dredge reached that pipeline crossing, Pontiff left instructions with the leverman on watch to call him when the dredge was 50 feet before the pipeline. The leverman misunderstood Pontiff's instructions. He thought that Pontiff was to be called when the dredge spuds were within 50 feet of the line, at which point the cutterhead would have already crossed the line. Instructions were relayed by him to the other leverman to proceed over the Texaco pipeline. Consequently, Pontiff was not summoned before the cutterhead started across the line.

**21.**

The exact location of the pipeline was well delineated by fully visible and legible signs stating: WARNING/DO NOT ANCHOR OR DREDGE. Bean was also put on notice of the correct location of the pipeline by provisions contained in the dredging contract.

**22.**

Bean failed to notify Texaco that the pipeline was being dredged over by Dredge No. 32, as mandated by the dredging contract and Bean's general plan, in order that a Texaco representative may be present during that procedure, although the evidence reveals that Bean in fact attempted to contact Texaco.

**23.**

Safe dredging practice requires that when a utilities owner is not present and the exact location of the crossing is unknown, dredging be suspended in the area of the crossing and that the dredge pass over the crossing, resuming dredging a safe distance beyond the crossing. Safe dredging practice, as well as the provisions of the general plan, also requires that a dredge tie off its cutterhead when it approaches within twenty-five feet of utility crossing.

**24.**

It is evident that Dredge No. 32 failed to undertake any of those safety practices recognized in Finding of Fact No. 23.

**25.**

The rupture in the natural gas pipeline allowed a mammoth amount of gas to be released from the line, sending mud, silt and water spraying fifty feet into the air.

**26.**

The rupture of the pipeline caused pressure in the pipeline to immediately drop. At 9:15 A.M. of the same day, Texaco was forced to shut off the gas flow at a block valve located on the Evangeline Line. The effect of closing this valve was to completely cut off the flow of natural gas to Consolidated's plant.

**27.**

The break in the pipeline was repaired by Texaco and a full gas supply was restored to Consolidated on April 15, 1980.

**28.**

Consolidated's plant consisted *inter alia* of the following facilities: (A) An electrically operated aluminum reduction pot line containing 71 operating smelting pots wherein alumina and bath materials are heated and melted in an electrolytic process by which molten aluminum is produced. Each pot utilizes 24 carbon anodes weighing in excess of a thousand pounds each which are suspended above the pots and project downward into the molten bath. The bottom of each pot consists of cathode blocks on which the aluminum is produced. (B) A gas fired coke calciner approximately 180 feet in length which is lined with refractory brick and refractory material. In this calciner green coke is subject to temperatures, which in portions of the calciner exceed 2,500 degrees Fahrenheit, and the green coke is thereby refined into calcined coke. (C) A power plant which utilizes natural gas to produce electric energy for plant operations. The power plan consists of three gas fired jet turbines, three steam boilers and two steam turbines, as well as associated electric generators.

**29.**

Because of the reduction in gas pressure and gas supply, Consolidated sustained physical damages to its equipment and work in process at the plant and attendant economic damages. These physical damages include: (A) Freezing (solidifying) of the liquid bath materials and liquid aluminum in the reduction pots; (B) Cracking and air burning of anodes in the reduction pots; (C) Cracking of cathode blocks in the reduction pots; (D) Air burning of side wall blocks in the reduction pots; (E) Burning of breaker bars in the reduction pots; (F) Loss of useful life of the reduction pots; and (G) Loss and cracking of calciner refractory materials.

**30.**

Consolidated's Lake Charles plant had no back-up or secondary source of power whatsoever. It was unique in this respect. The testimony of Mr. John Fitzgerald, formerly of Kaiser Aluminum, and Mr. Dwight Keller, formerly with Reynolds Aluminum, made it clear that the Consolidated Lake Charles Plant, with no secondary source or back-up, was unique in the aluminum industry. No other aluminum reduction plant is fed with power from only one source. Consolidated's situation was unheard of in the aluminum industry. Energy is the critical element in the aluminum industry. It is such a critical factor that a constant and continuing source(s) of it must exist. Consolidated's arrangement for gas delivery from Texaco only, with no secondary source or back-up, was inadequate.

**31.**

Mr. William Boyer, Consolidated's executive in charge of the original planning and construction of the plant, explained the reasons behind this peculiar situation. Mr. Boyer, in order to get the plant built, had to obtain power at a cost of no more than 4.0 mills per kilowatt-hour. Mr. Boyer went to great lengths to explain the ultimate cost to Consolidated of even a 1 mill increase in power cost. But with the Texaco contract cost, including the cost of the power plant to convert that gas into electricity, Mr. Boyer was able to arrange a power cost right at the 4.0 mills per kilowatt-hour budget. Consolidated would spend no more. Boyer did not even consider the cost of an oil storage tank for a back-up to fuel his turbines. That cost, estimated by Boyer to be $200,000, was prohibitive. Consolidated's gas turbines were designed to operate on liquid fuel oil as well as on natural gas, but Consolidated never made the necessary implementations. It was explained that the Lake Charles plant was at a considerable "disadvantage" because of its size. It was the smallest aluminum reduction plant in the United States. It did not have the production to "spread the cost" of other and suitable alternatives.

**32.**

Considering the actual delivery of Texaco's gas, even Mr. Boyer did not expect a "fail safe" system. Although he believed that Texaco's "vast distribution system" was a reliable one, Boyer did not evaluate

any of the risks to his plant in the event of an interruption in Texaco's "vast" pipeline system.

33.

Mr. William Kinney was employed as a construction inspector by the Crops of Engineers and was the primary field representative of the Corps of Engineers on this particular project. One of Kinney's responsibilities was to monitor the work done by Bean to insure compliance with the dredging contract. Kinney's office was aboard one of Bean's dredges (not Dredge No. 32). Kinney visited each dredge on the project two or three times a week.

34.

Kinney was not aboard the Dredge No. 32 at the time of the allision with the pipeline. He noted on previous occasion that the Dredge No. 32 was not using stakes, buoys, or markers in dredging; however, the dredge at that time was not operating in the vicinity of a utility crossing, and Kinney had no reason at that time to believe that the dredge would not follow the prescribed methods for dredge over and around utility crossings.

35.

The Corps of Engineers' permit issued prior to the construction of the original pipeline from the Hackberry Area to PPG required that where the PPG Lateral (Texaco pipeline) passed beneath the proposed Calcasieu Ship Channel, it should lay at a depth fifty feet below Mean Low Gulf for that area where the pipeline would be beneath and coextensive with the deepest portion of the Ship Channel (four hundred feet). The measurements were based upon the theoretical location of the Ship Channel inasmuch as it had not yet been dredged when the PPG Lateral was laid. Once the Ship Channel began to slope upward, it was the requirement that the Texaco pipeline remain ten feet beneath the side slopes of the channel, the ten feet being measured along a line perpendicular to the side slopes. Surveys performed following the accident established that the Texaco pipeline was clearly marked and buried to its required depth or greater, particularly in the area of the break.

36.

Prior to April 5, 1980, there was no block valve in the Texaco pipeline system between the east bank of the Calcasieu River and the point at which the Evangeline Line tied into the Texaco pipeline so as to enable Texaco to isolate the section of the pipeline which crossed the channel in the event of a rupture of the pipeline.

37.

As a result, in the instant situation, Texaco was forced to close a block valve on the Evangeline Line and a block valve at Point C in order to isolate the rupture occurring in the Calcasieu River. The result of this was that the natural gas supply to Consolidated's plant was cut off.

38.

There was conflicting expert testimony presented at trial by the parties regarding whether or not sound engineering practices dictated that Texaco should have had a block valve located on the east bank of the channel crossing so that it could have been closed instead of the valve located on the Evangeline Line. Had such a block valve existed, Consolidated would have continued to receive a flow of natural gas.

39.

Mr. Roger Craddock, testifying as Consolidated's expert witness, maintained that sound engineering practice required the placement of such a block valve on the east bank of the channel. However, Craddock admitted that no government regulation or industry standards code require such a placement of a valve.

40.

On the other extreme, Mr. Johnny Atwood, testifying as Texaco's expert witness, stated that all reasonable design precautions were taken by Texaco and all applicable industry standards, government codes and sound engineering practices had been conformed with in designing and constructing the pipeline.

**41.**

Consolidated also points to the fact that Texaco, subsequent to the accident, installed a block valve on the east bank of the channel crossing and suggests that Texaco should have installed the valve prior to the allision. However, Mr. Atwood testified that the valve was added after the repairs to the pipeline were made as merely a precaution against the possibility that the ends of the pipeline might pull away from the clamps used to reconnect them.

**42.**

After careful reflection, this Court agrees with the expert opinion of Atwood and accepts his conclusions as to reasonableness of Texaco's design and construction of the pipeline system.

## DISCUSSION OF LAW AND RULING

This Court has jurisdiction of this action as an admiralty and maritime claim, as well as under diversity of citizenship jurisdiction, and venue is proper in the Western District of Louisiana.

The issues presented for resolution by this Court are: whether the various parties owed any duties of care; to whom those duties were owed if any existed; whether any of these duties were breached; and what damage resulted as a consequence of those breaches, if any, occurred.

## CONSOLIDATED'S CLAIM AGAINST BEAN

■ The Fifth Circuit, in denying a rehearing on its reversal of this Court's summary judgment, aptly characterized the situation presented to this Court on remand:

Our discussion of the Robins Dry Dock/TESTBANK line of cases showed that the 'pragmatic limitation upon the tort doctrine of foreseeability,' *State of Louisiana, ex rel. Guste v. M/V TESTBANK*, 752 F.2d 1019, at 1023 (5th Cir. 1985), established by these cases, is inapplicable to the instant case because the plaintiff Consolidated unquestionably suffered physical harm to its own property. We further conclude that the mere

existence of 'a contract between Texaco (whose property suffered the most immediate harm from the defendant's dredging) and Consolidated does not create a legal bar to Consolidated's claim against Bean for negligent dredging. We in no way intimated that Consolidated could recover for 'negligent interference with contract.' Nor did we hold that summary judgment for the defendant would necessarily be improper on the facts of the instant case. Rather, we remanded because the district court expressly omitted to review the issue of foreseeability with regard to negligent dredging. We expressly declined to reach the question of 'whether Consolidated's claim of negligence would withstand scrutiny under a foreseeability test,' 772 F.2d at 1218 n. 2, and left the application of traditional tort principles, including foreseeability and the related concept of legal duty, for the trial court to determine on remand, at 1224.

*Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 772 F.2d 1217 at 1224 (5th Cir.1985).

This Court must now consider the legal duty owed by Bean, the scope of that duty, to whom it was owed, and the foreseeability of Consolidated's harm. Foreseeability is defined as "... the reasonable anticipation that harm or injury is a likely result of acts or omissions." Blacks Law Dictionary, 5th ed. The issues of whether Bean owes a duty to Consolidated, and whether the conduct of Bean in regard to Consolidated was negligent, turn on whether Bean could have reasonably anticipated the risk of physical harm (as well as economic) to Consolidated.

[A] tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong. [Robins Dry Dock], 275 U.S. [303] at 309, 48 S.Ct. [134] at 135.

*Cargill, Inc. v. Doxford and Sunderland, Ltd.*, 782 F.2d 496 at 498 (5th Cir. 1986).

In *PPG Industries, Inc. v. Bean Dredging*, 447 So.2d 1058 (La.1984), a case involving the same accident as that in the instant case, the Louisiana Supreme Court, when confronted with PPG's claims for indirect losses and additional fuel costs resulting from the rupture of Texaco's pipeline, held that the particular risk, that being the risk of shutting down the PPG plant, was not encompassed by Bean's duty not to negligently damage Texaco's pipeline. *Id.* at 1059–1060.

The Louisiana Supreme Court, as was suggested to this Court by the Fifth Circuit in the instant matter, applied duty-risk analysis. Finding that PPG's losses were indirect, that Court stated that:

[T]here is clearly an ease of association in the present case between the rule of law which imposes a duty not to negligently damage property belonging to another and the risk of injury sustained by [PPG] because of the damage to its property. As noted, however, a rule of law is seldom intended to protect *every* person against *every* risk. It is much more difficult to associate the same rule of law, in terms of the moral, social and economic values involved, with the risk of injury and the economic loss sustained by the person whose only interest in the pipeline damaged by the tortfeasor's negligence arose from a contract to purchase gas from the pipeline owner. It is highly unlikely that the moral, social and economic considerations underlying the imposition of a duty not to negligently injure property encompass the risk that a third party who has contracted with the owner of the injured property will thereby suffer an economic loss. *Id.* at 1061.

This Court recognizes that the *PPG* case involved what appeared to be only economic losses; however, this Court is of the firm opinion that the rationale, espoused by the Louisiana Supreme Court therein, applies as well to the instant matter relating to the physical damage suffered by Consolidated.

Here, the duty owed by Bean is the same as that found in the *PPG* case. Clearly, the evidence shows that Bean owed a duty to conduct its dredging operations in a reasonable manner so as to avoid causing physical damage to owners of pipelines located in the area of the dredging operations. Breach of that duty would create a recognizable harm to a pipeline owner such as Texaco.

In *Diamond State Tel. Co. v. Atlantic Refining Co.*, 205 F.2d 402 (3rd Cir.1953), a case involving an allision between a tanker and a telephone cable laying across a ship channel, the Third Circuit found that:

Here we have the unforeseeable libellant, a maritime instance of the landlubber's unforeseeable plaintiff. The scope of the Yeager's duty is not to be determined by what we know now but by what those aboard her knew or should have known as they approached the flotilla. They knew that there were one or more vessels ahead of them and that any unseamanlike navigation on their part would subject those vessels to an unreasonable risk of harm. Thus, they had a duty to navigate so as not to create such risk, and they did. They could not possibly have foreseen that poor navigation would have subjected libellant's cable to an unreasonable risk of harm because they neither knew nor should have known that the cable was there. Thus, as to the cable, there was no duty and, consequently, could be no negligence. *Id.* at 407.

Though somewhat factually dissimilar to this case, the rationale expressed by the Court is applicable here.

In the instant matter, though Bean had knowledge of the pipeline crossing or at least should have had knowledge, Bean could not have possibly foreseen that its improper dredging practices would have subjected Consolidated's plant, so remotely located, to an unreasonable risk of harm because Bean did not know, nor should it have known of Consolidated's connexity to the pipeline. Thus as to Consolidated's plant, there was no duty and therefore no negligence on the part of Bean.

Consolidated, however, is not a pipeline owner. Neither is Consolidated an owner

of any property near the site of the rupture of Texaco's pipeline, unlike PPG whose plant was located proximate to the pipeline. Consolidated's damage occurred only because Texaco was unable to deliver the natural gas as was contracted for by Consolidated and Texaco. Only after that natural gas supply was interrupted did the physical damage to Consolidated's facilities occur. Consolidated's plant was located more than six miles away from the point of rupture, on a different body of water, and "upstream" in Texaco's gas distribution system. It is clear that Bean had no knowledge of Consolidated's connexity to the Texaco pipeline. There was nothing to even suggest that Bean reasonably anticipated or should have reasonably anticipated that a rupture of the Texaco pipeline would cause such physical damage to such a remotely located plant. Consolidated was so far outside the zone of any obvious danger from Bean's dredging that no reasonable person would have anticipated that Consolidated would suffer physical harm as a result of Bean's dredging. In comparison to the *PPG* case, the possibility of physical harm involved here was much more remote and attenuated than the mere possibility of economic loss.

For the foregoing reasons, this Court finds that the physical damage sustained by Consolidated was an unforeseeable consequence of the rupture of Texaco's pipeline by Bean, and therefore, Bean is not liable.

■ However, we will also address the issue of whether Consolidated is entitled to punitive damages from Bean in the event the appellate court disagrees with our conclusion that Bean was not negligent in its conduct toward Consolidated and is not liable to Bean.

Under general maritime law, punitive damages may be recovered when a wrongdoer has acted willfully and with gross disregard for the plaintiff's rights. *Complaint of Merry Shipping, Inc.*, 650 F.2d 622 at 625 (5th Cir.1981). In the instant matter, this Court is unable to conclude that the conduct of Bean and/or its employees was willful and in gross disregard for the rights of Consolidated. Pontiff gave instructions that he was to be notified when the dredge approached within fifty feet of the pipeline crossing. These instructions may have been ambiguous and could have been misunderstood by the crew. As a result, the cutterhead had already started across the pipeline when Pontiff was notified. Though this conduct may have constituted negligence, it cannot be said that it was willful and in gross disregard of Consolidated's rights.

■ Additionally, the principle or master cannot be cast for punitive damages for the willful or reckless act of an agent or employee unless the act was committed with the approval and knowledge of the principle. *McGuffie v. Transworld Drilling Co.*, 625 F.Supp. 369, 371 (5th Cir.1985). Even assuming that Pontiff and/or the crew of Dredge No. 32 acted willfully and with gross disregard for Consolidated's rights, Bean, as master or principal, would not be liable for punitive damages arising as a result of that conduct. Pontiff had total authority and discretion in running the dredging operations. Bean had provided a plan of dredging which met all requirements of established safety practice. It is readily apparent that Bean expected and depended upon Pontiff to carry out that plan. There is nothing in the record to indicate that Bean, as a routine and continuing practice, allowed, approved or had knowledge of dredging operations conducted in contravention of submitted dredging plans and accepted dredging practices.

We now address the other various claims made in this case.

### ALL CLAIMS AGAINST THE UNITED STATES [2]

■ The evidence presented at trial and herein previously outlined in this Court's

---

**2.** Consolidated has cited for our consideration the case of *City of New Orleans, Etc. v. United States*, 501 F.Supp. 164 (E.D.La.1980) as the only precedent for liability of the United States. However, this decision was subsequently reversed by the United States Fifth Circuit Court

findings of fact, clearly reveals that Bean acted as an independent contractor of the United States. Equally clear is the rule of law which provides that a contractee is generally not liable for the torts of an independent contractor. *Kirk v. United States*, 270 F.2d 110, at 116 (9th Cir.1959). Nor does the fact that the United States retains the right to inspect work under construction to see that the provisions of the contract are carried out, and also the right to stop work if they are not, provide sufficient basis to hold the United States liable for damage resulting from negligence of the contractors in the performance of the contract. *Id.* at 116–117. Additionally the issuance of regulations relating to safety does not render the United States liable for an independent contractor's negligence. *Market Insurance Company v. United States*, 415 F.2d 459, at 463 (5th Cir.1969).

Therefore, it is the conclusion of this Court that the United States is not liable for damages occasioned by the fault of Bean to any party to this suit.

■ It is to be additionally noted that Texaco cannot recover its own damages from the United States on an independent basis of liability in light of Clause (g) of the Corps of Engineers permit granting Texaco permission to lay its pipeline across the Calcasieu River which provides:

> That the United States shall in no case be liable for any damage or injury to the structure or work herein authorized, which may be caused by or result from future operations undertaken by the Government for the conservation or improvement of navigation or for other purposes and no claim or fight to compensation shall accrue from any such damage.

The courts of this nation have upheld the validity of this clause which disclaims liability on the part of the United States for any damage or injury to a structure authorized by a Corps of Engineers permit. See *Boston Edison Co. v. Great Lakes Dredge and Dock Co.*, 423 F.2d 891 (1st Cir.1970); *Pacific Northwest Bell Tel. Co. v. United States*, 549 F.2d 1313 (9th Cir.1977), *cert. denied* 434 U.S. 820, 98 S.Ct. 62, 54 L.Ed.2d 76 (1977).

## TEXACO'S CLAIM AGAINST BEAN

■ This Court now turns its attention to Texaco's cross-claim against Bean for the costs of repairing its pipeline and the value of the natural gas lost due to the breaking of the pipeline by Bean.

'It is well established that there is a presumption of fault against a moving vessel that strikes a statutory object, such as a dock or navigational aid.' *Freeport Sulphur Co. v. S/S HERMOSA*, 368 F.Supp. 952, 953 (E.D.La.1973); *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724 (5th Cir.1967). 'In admiralty, this presumption does more than merely require the ship to go forward and produce some evidence on the presumptive matter. The moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident.' *Patterson Terminals, Inc. v. S/S JOHANNES FRANS*, 209 F.Supp. 705, 707 (E.D.Pa.1962), citing *Carr v. Hermosa Amusement Corp., Ltd.*, 137 F.2d 983, 985 (9th Cir.1943). We have held that '[t]he burden is heavily upon the vessel asserting [the inevitable accident] defense.' "Such vessels 'must exhaust every reasonable possibility which the circumstances admit and show that in each they did all that reasonable care required.'" *Brown & Root Marine Operators, Inc., supra*, 377 F.2d at 726. *Bunge Corp. v. M/V FURNESS BRIDGE*, 558 F.2d 790 at 793–794 (5th

of Appeals in 1981 on other grounds in an unpublished opinion (665 F.2d 350) and the appellate court did not address the issue of whether the United States, through the Corps of Engineers, could in fact be held liable for the torts of a dredging contractor. As such this Court does not feel compelled to follow the ruling of the District Court in *City of New Orleans;* but, instead chooses to follow the established law of the United States as analyzed in the text of this opinion.

Cir.1977), *cert. denied* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978) (footnote omitted).

The presumption applies to an instance where the fixed object happens to be a submerged pipeline. *Marathon Pipeline Company v. Drilling Rig Rowan/Odessa,* 527 F.Supp. 824 (E.D.La.1981), *aff'd.* on other grounds, 699 F.2d 240 (5th Cir.1983), *cert. denied sub* nom. 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983), reversed on other matters, 761 F.2d 229 (5th Cir.1985). A pipeline owner is not guilty of any fault or neglect which contributed to damage sustained by the pipeline when it is struck by a vessel, where the pipeline is properly laid in accordance with required permits. *Id.* at 831.

In the instant case, it is undisputed that the Bean dredge struck Texaco's pipeline, and it is abundantly clear that Bean knew or should have known where the pipeline was located. The location of the pipeline was specifically stated in the dredging contract and the actual traversal of the channel by the pipeline was clearly marked by warning signs situated directly across the pipeline. Bean certainly owed a duty to Texaco to exercise caution in dredging around the pipeline.

Bean attempted, at trial, to overcome the presumption of fault by asserting that Texaco's pipeline was not laid in accordance of the requirements of the Army Corps of Engineers permit, and that this was in fact the cause of the allision between the Bean dredge and the pipeline. However, the evidence, as reflected in the Findings of Fact, reveals that the pipeline was indeed laid according to permit requirements, and that it was covered by the requisite ten feet of cover at the point where the dredge struck it. Even if this Court were to assume that the pipeline was mislaid as Bean contends, the evidence clearly establishes that Bean did not follow the requirements for dredging over and around Texaco's pipeline, and that Bean's course of conduct would have resulted in an allision with the pipeline regardless of the pipeline's exact location.

Bean has not met its burden of overcoming this presumption of its fault. This Court also notes, as previously stated, that Bean was negligent and breached its duty to Texaco. This Court therefore concludes that Bean is liable to Texaco for the costs of repairing the pipeline and the value of the natural gas lost due to the rupture.[3]

■ Though punitive damages are available under general maritime law, they are not warranted in this instance. Bean's conduct was certainly eggregious; however, there is no evidence to suggest that Bean acted willfully or wantonly. See discussion of punitive damages under this Court's discussion of CONSOLIDATED's CLAIM AGAINST BEAN.

### CONSOLIDATED'S CLAIM AGAINST TEXACO

■ Consolidated also makes a claim against Texaco alleging that Texaco did not act in a reasonable and prudent manner in protecting Consolidated from the possibility of a break in the pipeline because it failed to install a bypass valve on the upstream bank of the river so that the valve could be closed in the event, such as this, of a rupture of the pipeline, thus allowing the continuing flow of natural gas to Consolidated's plant.

However, the evidence presented at trial shows that Texaco was under no duty to place such a bypass valve on the upstream bank of the river. Texaco's expert witness, Mr. Johnny Atwood, a well-qualified natural gas expert, testified that all reasonable design precautions had been taken by Texaco, and that the Texaco pipeline system was designed and constructed in conformity with all applicable industry standards, government orders and sound engineering practices. And though Consolidated's own expert, Mr. Roger Craddock, testified that he was of the opinion that the pipeline was not built in accordance with sound engineering practices, he also admitted that no government regulation or industry standards code required the placement of any bypass valve different from the existing layout of the pipeline. Mr. Atwood also

---

**3.** The issue of quantum has been reserved for resolution at a later date.

testified that the purpose of the subsequent addition of a valve during the repair of the ruptured pipeline was merely a precaution taken in the event the ends of the ruptured pipeline pulled away from the clamps used to repair the rupture, and that such a subsequent addition did not imply that a valve should have been installed prior to the accident.

There is also no evidence to indicate that Texaco breached any other duty owed to Consolidated. Indeed, Texaco did not have a duty to guard Consolidated against the unexpected negligence of a third party (Bean). This Court finds that Texaco acted in a reasonable and prudent manner in all respects, and is accordingly not liable to Consolidated in any manner.

## CONCLUSION

For the foregoing reasons, judgment is entered in favor of Texaco and against Bean for the costs of repairing its pipeline and the amount of gas lost due to the rupture.

All other claims involved are hereby DISMISSED.

Bean is hereby ORDERED to prepare a judgment in accordance with this opinion, subject to federal Rule of Civil Procedure 54(b).