**BINGHAMTON MASONIC TEMPLE, INC., William T. Whitman Derivatively on Behalf of Binghamton Masonic Temple, Inc., and William T. Whitman, Individually, Plaintiffs,**

v.

**Emmerich BARES, Jacob Webber, Lloyd Harrison, S. Paul Jones, G. Bernard Freer, Thomas Barbour, Secretary of the Department of Housing and Urban Development of the United States of America, Dale F. Perry, Postmaster of the United States Postal Service, Defendants.**

No. 95–CV–1469.

United States District Court, N.D. New York.

July 15, 1996.

Office of Mel M. Marin, Endwell, New York (Mel Milivoj Marin, of counsel), for Plaintiffs.

Office of Terrence R. Dugan, Endicott, New York (Terrence R. Dugan, of counsel), for Defendants Emmerich Bares, Jacob Webber, Lloyd Harrison, S. Paul Jones, G. Bernard Freer and Thomas Barbour.

## MEMORANDUM–DECISION AND ORDER

McAVOY, Chief Judge.

## I. THE PARTIES

Plaintiff, William T. Whitman, is the former president of Binghamton Masonic Temple (hereinafter "BMT"). He alleges that he is still the true president of BMT and in this capacity brings this action on behalf of BMT. Plaintiff, BMT is a non-profit corporation organized under the laws of New York State. The Defendants Bares, Weber, Harrison, Jones, Freer and Barbour[1] are officers, trustees and members of BMT. The present motion is brought by the defendants and seeks the imposition of sanctions against the plaintiffs and their attorney pursuant to Fed. R.Civ.P. 11.

## II. PROCEDURAL BACKGROUND

On October 13, 1995, the Plaintiffs filed their original claim alleging, *inter alia*, that Defendants violated; 18 U.S.C. § 1962 (hereinafter "RICO"); 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5, fraud under the Federal Securities Exchange Act. The Plaintiffs' claim sought $3 million in damages. On No-

---

1. The Secretary of HUD and the Postmaster General have also been named as defendants in this suit. Yet, for the purpose of this action Defendants refers only to Bares, Weber, Harrison, Jones, Freer and Barbour.

vember 11, 1995 the Plaintiffs filed a Civil RICO statement as directed by Judge McAvoy's Order of October 10, 1995. The Defendants filed a motion to dismiss on February 28, 1996.

The Plaintiffs were served on March 13, 1996 with notice that the Defendants' intended to move pursuant to Fed.R.Civ.P 11 for sanctions against Mr. Whitman and his attorney Mr. Mel M. Marin. On March 20, 1996. Mr. Marin, moved to withdraw as Plaintiffs' attorney. Mr. Marin's motion was denied by the Court on March 21, 1996. On April 22, 1996, the Court dismissed the Plaintiffs' claims, with prejudice, against the non-federal Defendants; Bares, Weber, Harrison, Jones, Freer and Barbour. In that Order the Court found that Mr. Whitman could not bring a derivative action on behalf of BMT because he failed to comply with Fed. R.Civ.P. 23.1 and that the SEC and RICO claims did not state a claim upon which relief could be granted.

On April 29, 1996, the Defendants moved for sanctions against Mr. Whitman and Mr. Marin pursuant to Fed.R.Civ.P. 11. This motion is presently before the Court. On May 9, 1996, the Plaintiffs moved pursuant to Fed.R.Civ.P. 59 for an order to alter or amend the Court's April 22, 1996, Order. The Court's May 22, 1996, Decision & Order postponed consideration of the Rule 59 motion until this Rule 11 matter is resolved.

## III. FACTS

Mr. Whitman, was the president of BMT from the mid 1980's–1992.[2] During his administration he acted as the corporation's *de facto* treasurer and general contractor with regard to a renovation project at the Masonic Temple Building (hereinafter "MTB") building owned by BMT. This renovation began in 1987 and approximately $1.7 million was borrowed by BMT to complete the project.

The loan was guaranteed by the Department of Housing and Urban Development (hereinafter "HUD") and administered by the City of Binghamton. Due to cost over runs and a contractual dispute, funding for the project was stopped in early 1990. Consequently, BMT sued the City of Binghamton alleging $1.7 million in damages. In the Spring of 1994 judgment was entered in favor of BMT for $15,000. Without the permission of the Board Mr. Whitman instructed BMT's attorneys, Hinman, Howard & Kattell, to appeal the judgment.

In 1987, at properly convened meetings, the trustees voted unanimously to lease a building owned by Mr. Whitman (the "Elgin Building"). After BMT and Mr. Whitman executed the agreement (hereinafter "Agreement"), BMT made a number of rental payments to Mr. Whitman.

In 1992, BMT's Trustees grew worried about Mr. Whitman's exclusive control of BMT's finances and his occupation of the roles of president, trustee, general contractor, treasurer, and landlord. Only Mr. Whitman held a key to the Elgin Building, and he allegedly refused Board requests that he furnish keys to other officers and trustees. Sometime in 1992, Defendant Bares and other members of a constitutive body ceased to use the Elgin Building as a meeting place. BMT began to fall behind on its rental payments for the use of the Elgin Building and Mr. Whitman secured a default judgment against BMT in 1992 for $97,000 in rent due and owing.

Upon learning of the default judgment Mr. Whitman was severely criticized by the Board. Thereafter, Mr. Whitman cancelled BMT's monthly meetings and allegedly attempted to interfere with the annual election of new officers in 1993[3]. New officers were elected and Defendant Barbour replaced Mr. Whitman as President: the current president

---

**2.** This fact is ·disputed. Plaintiffs claim that Whitman is still president because the present person in that office, Defendant Freer, was elected "illegally." Defendants claim that Barbour and Freer were properly elected according to BMT's bylaws.

**3.** According to BMT's bylaws officers are elected annually on the first Wednesday of each January.

Seven Board members constitute a quorum at regular, special, and annual meetings. In order to pass a corporate resolution or motion, a majority of those present and voting at a meeting must approve. The president of BMT cannot cancel a meeting unless a "state of emergency" exists.

of BMT is Defendant Freer.[4]  Mr. Whitman notified the Board in a letter dated February 11, 1993 that he believed that the new officers were elected illegally in contravention of the bylaws and that he was "the only person authorized to speak for Binghamton Masonic Temple."

In September of 1995 the Board brought a motion in Binghamton City Court against Mr. Whitman to vacate his 1992 default judgment on the grounds of fraud.  In response to this, Mr. Whitman sent a letter dated October 6, 1995, to the Board demanding, *inter alia*, that the officers cease their actions, relinquish their offices and each pay him $3 million for BMT's costs, losses and attorney's fees.  Additionally, Mr. Whitman iterated that the 1993 and subsequent elections were "*ultra vires* and/or illegal under the laws of the State of New York and of the United States in [an] effort to gain and exercise control of the corporation."

### A.  The Basis for the Plaintiffs' 15 U.S.C.  § 78j(b)  and  17  C.F.R. § 240.10b–5 Claims

The basis for the Plaintiffs' SEC claim was that the Defendants were improperly elected by trading "voting blocks" in exchange for a promise that BMT would not have to pay Mr. Whitman the 1992 default judgment.  The Plaintiffs claimed that these votes were fraudulently obtained and were "securities" within the meaning of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5.

These are the bases of the Plaintiffs' RICO claim.  The Plaintiffs alleged that between January, 1993, and January, 1995, the Defendants carried out a scheme to take over BMT, prevent BMT from paying its debt to Mr. Whitman, and prevent BMT from making further rental payments to him pursuant to the Agreement.  During that time, the Defendants stopped participating in regular BMT meetings and held their own "irregu-

lar" meetings, despite Mr. Whitman's instructions to the contrary.

Furthermore, the Plaintiffs allege that in July 1992, Defendant Bares broke into the Elgin Building for the purpose of committing a burglary.  Sometime between Fall, 1994, and Fall, 1995, the Defendants broke into the old BMT building for the same purpose.  The Plaintiffs allege that in January, 1995, the Defendants declared that they controlled BMT, had elected themselves in secret meetings as a new majority, held themselves out as officers of BMT, and began to seize and sell or destroy a number of movable BMT assets without notice or authorization.  Between January and September, 1995, the Defendants allegedly stole BMT property for their own benefit.  Defendants Barbour, Bares, Harrison, and Weber, by use of the mails and wires, represented themselves as controlling officers to HUD and convinced HUD to alter the terms of a mortgage contract with BMT.  Additionally, the Defendants collected a debt from BMT that BMT did not owe, changed the lock on BMT premises, and conveyed possession of MTB to the Defendants.  In addition, the plaintiffs allege that the Defendants made and solicited offers for the sale and transfer of the MTB with the intent of denying Whitman of his right to collect rental charges.

The Plaintiffs also allege that Defendants Bares, Weber, and Harrison, unlawfully intercepted and stole mail addressed to Mr. Whitman and used deceit to arrange with the United State Postal Service for the diversion of Mr. Whitman's mail to the Defendants.[5]

### B.  The Basis for Defendants' Rule 11 Claim

The Defendants assert that the purpose of the Plaintiffs' Complaint was to harass them and to disrupt BMT's annual meeting on the first Wednesday in January 1996.  The Defendants were served in mid-December 1995 with summonses, the Complaint and subpoe-

---

**4.**  *See supra* p. 3 n. 1.

**5.**  The theory behind the Plaintiffs' claim against the Postmaster General was that local postal employees in Binghamton cooperated with the Defendants to steal Mr. Whitman's mail by allowing Defendants to file fraudulent change of ad-

dress cards.  The theory behind the Plaintiffs' claim against HUD was that HUD officials conspired with the Defendants to sabotage the renovation of MTB by cutting off funding.  The Plaintiffs claims against the federal Defendants are not before the court at this time.

nas requiring them to attend depositions, produce documents and allow inspection of certain premises. This allegedly was done in violation of Federal and Local rules and with the *improper purpose of harassing* the Defendants, needlessly increasing the costs of litigation, and retaliating against the defendants for supporting BMT's motion to vacate Whitman's 1992 judgment.[6]

The Defendants allege that the Plaintiffs' legal claims are not warranted by existing law or by a non-frivolous argument for the extension, modification or reversal of existing law or the establishment of new law. The allegations made against The Defendants have no evidentiary support. Mr. Marin did not make a reasonable inquiry as to the law or the facts of the case as required by Rule 11. These allegations are supported, *inter alia*, by the following circumstances;

(a) Mr. Marin was retained only by Mr. Whitman. Therefore, Mr. Marin has no authority to prosecute this action in the name of BMT. Furthermore, Mr. Marin could not ethically represent both Mr. Whitman and BMT because of a conflict of interests.

(b) No viable claim exists for a Rule 10b–5 violation or under the RICO statute against the Defendants.

(c) There is no evidence to support the Plaintiffs' allegation that the Defendants: fraudulently traded votes for the promise of challenging Mr. Whitman's debt; burglarized Mr. Whitman's building; stole his mail or conspired with HUD.

(d) Overwhelming evidence has been presented that the Defendant's are the true Officers of BMT and that Mr. Whitman is no longer an officer of BMT.

The Defendants believe that unless Mr. Marin and Mr. Whitman are sanctioned they will continue to commence legal proceedings in the name of BMT. The Defendants desire $15,000 in monetary sanctions for the amount of Attorney's fees already spent defending this action. The Defendants' attorney has spent 104.6 hours at $125/hr in defense of the Plaintiffs' claims and expects to expend more

than 120 hours in prosecuting this Rule 11 claim. Furthermore, the Defendants' believe that Mr. Marin and Mr. Whitman should pay a penalty to the court. Mr. Marin should be censured from commencing and prosecuting this action and should be required to participate in seminars and other legal educational programs.

### C. Mr. Marin's Response to Defendant's Rule 11 Motion

Mr. Marin states that the Plaintiffs are the first clients that he has represented on his own. Previously, he had been employed as a law clerk for Judge Price of the United States District Court for the Eastern District of California. For almost five years after this clerkship ended Mr. Marin did not work as an attorney due to medical complications resulting from a car accident. He states that during this time he "had no office, no secretary, no transportation, no phone, no money and, therefore, [could not] take work ..."

Mr. Marin alleges that Mr. Whitman "asked over and over to allow them to pay whatever it takes for [Mr. Marin] to take the case before it's too late." After Mr. Whitman described how the Defendants' were attempting to take over BMT, Mr. Marin agreed to take the case on certain conditions: (a) a separate attorney would be retained for the Temple alone; (b) a separate Mason not in either group would be assigned to review his steps taken for the Temple; (c) a separate Mason would seek assistance from another attorney who is a Mason in Binghamton; (d) that Mr. Marin would be paid in advance $25/hr. as retainer to set-up, travel and conduct legal research and drafting; and (e) that both Mr. Whitman and BMT would agree that their failure to replenish the retainer would be the same as immediate discharge. Mr. Marin alleges that Mr. Whitman signed such a statement and BMT's Board agreed.

Mr. Marin alleges that he was lead to believe that the case was a routine collection matter and was not aware of the extent of

---

**6.** On January 30, 1996, Magistrate Judge Hurd quashed Plaintiffs' subpoenas and ordered that all pre-trial discover be stayed pending Judge McAvoy's decision on Defendants' motion to dismiss.

the matter. Following the 1994 judgment against HUD, Mr. Whitman stopped paying Mr. Marin's fees and the attorney retained for BMT resigned. During Mr. Marin's search for a replacement he allegedly was informed that he had been "sucked into a big game ... and that [Mr. Whitman] had manipulated other attorneys to do work for free and that was why no one would represent them."

Additionally, Mr. Marin states that he has been plagued with medical emergencies. Mr. Whitman had a heart attack and surgery which eliminated all contact for several weeks during which he made the Rule 11 and 12 responses and the Rule 59 motion. Mr. Marin's father suffered his own heart problems and needed money. Mr. Marin sent what he could, and allegedly had to move out of his Washington D.C. apartment and use the security deposit to pay for his appearances in Binghamton.

## IV. DISCUSSION

Fed.R.Civ.P. 11 states, in relevant part

(b) Representations to Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law, [and]; ...

(3) the allegations and other factual contentions have evidentiary support....[7]

■ The main purpose of Rule 11 is to deter frivolous claims and curb abuses of the legal system, thereby speeding up and reducing the costs of litigation. *Kirschner v. Zoning Bd. of App. of Valley Stream*, 159 F.R.D. 391, 395 (E.D.N.Y.1995). However, Rule 11 sanctions should be imposed with caution, *MacDraw Inc. v. CIT Group Equipment Financing Inc.*, 73 F.3d 1253, 1257 (2d Cir. 1996), and "should not be imposed so as to chill creativity or stifle enthusiasm or advocacy." *Kirschner*, 159 F.R.D. at 395. Yet, attorney creativity may not transcend the facts. *Levine v. F.D.I.C.*, 2 F.3d 476 (2nd Cir.1993).

### A. Objective Standard

■ The question of whether or not a signer of a filing has violated Rule 11 is determined by an objective standard of reasonableness. *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 548, 111 S.Ct. 922, 931–32, 112 L.Ed.2d 1140 (1991), *MacDraw*, 73 F.3d at 1257. "Subjective good faith provides no safe harbor." *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985). This inquiry must focus on conduct of the parties and their counsel at the time of the submission. *D'Orange v. Feely*, 877 F.Supp. 152, 160 (S.D.N.Y.1995). "However, a litigant's obligations with respect to the contents of these papers are not measured solely as of the time they are filed or submitted to the court, but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit." Fed.R.Civ.P. 11, Advisory Committee Notes for 1993 Amendments.

Under the objective standard, in order to warrant an award of Rule 11 sanctions on the basis that a complaint is not grounded in fact or law, "it must be 'patently clear that a claim has absolutely no chance of success.' " *Sussman v. Bank of Israel*, 56 F.3d 450, 457 (2d Cir.1995). By signing a paper submitted to the Court the signer is certifying that he/she had done an inquiry reasonable under the circumstances that the claim is: not for an improper purpose; warranted by existing law or a non frivolous modification or rever-

7. *See Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 658 (S.D.N.Y., 1996).

sal of existing law; and warranted by evidentiary support. *See* Fed.R.Civ.P. 11(b). " 'An argument constitutes a frivolous legal position for purposes of Rule 11 sanctions if, under an objective standard of reasonableness, it is clear ... that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands.' " *Morley v. Ciba–Geigy Corp.*, 66 F.3d 21, 25 (2d Cir.1995), *citing, Caisse Nationale de Credit Agricole–CNCA, New York Branch v. Valcorp, Inc.*, 28 F.3d 259, 264 (2d Cir.1994).

### i. The Plaintiffs' 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5 Claim

■ The Plaintiffs' Section 10(b) and Rule 10b–5 claims were based upon a United States Supreme Court Case, *Virginia Bankshares Inc. v. Sandberg*, 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), and a case from the D.C. Circuit, *Berg v. First American Bankshares, Inc.*, 796 F.2d 489 (D.C.Cir.1986). While these cases do discuss voting proxies in the context of Section 10(b) and Rule 10b–5, they are not even remotely analogous to the Plaintiffs' claim. Nor do they conclusively demonstrate that voting proxies, in and of themselves are securities within the meaning of Section 10(b) and Rule 10b–5. After reading these cases, even in light of Mr. Marin's economic and personal problems and the Court's reluctance to issue sanctions, the Court finds that it is objectively reasonable to find that the Section 10(b) and Rule 10b–5 claims were frivolous.

In order to have standing to assert a claim under Section 10(b) and Rule 10b–5 the Plaintiff must be a purchaser or seller of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Even if "voting blocks" were securities within the meaning of Section 10(b) and Rule 10b–5, which they are not, clearly Mr. Whitman was not a purchaser or seller of securities. It is clear that Mr. Marin failed to research the applicable law as to his clients standing to bring this claim. If Mr. Marin had performed a reasonable inquiry into this matter the meritlessness of the claim would have been beyond question. It is patently clear to the Court that by conducting a reasonable inquiry into the juris-

prudence concerning Section 10(b) and Rule 10b–5 claims Mr. Marin would have learned that the Plaintiffs' claims had no chance of success, because the plaintiffs lacked standing.

### ii. The Plaintiffs' RICO Claim

The Plaintiffs' RICO claim is based completely on speculation and conjecture. The Plaintiffs' Statement of Material Facts dated February 28, 1996, provides no tangible evidence of the Defendants' criminal conspiracy and grossly mischaracterize the Defendants' actions. In addition, the Plaintiffs' Points and Authorities in Opposition dated February 28, 1996, supply the Court with no legal basis in support of the plaintiffs' RICO claim.

The Plaintiffs' RICO claim has no chance of success. Apparently, Mr. Marin believed that a compilation of unsubstantiated allegations was all that was necessary to bring a claim before the Court. From an objective standpoint the Plaintiffs' RICO claim was not well grounded in fact or law. Thus, the assertion of such a claim supports the imposition of sanctions.

### iii. The Plaintiffs' Remaining Claims

The Plaintiffs' remaining claims for: breach of contract, breach of fiduciary duty, conversion, deceit, and interference with prospective contract are frivolous. They are based entirely upon speculation and conjecture, and are factually and legally footless.

### C. Improper Motive As A basis For Sanctions

Fed.R.Civ.P. 11(b)(2) states that it is an improper purpose if a filing is submitted to harass, cause unnecessary delay, or increase the cost of litigation. The Defendants assert that Mr. Whitman and Mr. Marin filed their October 13, 1995, Complaint for the purpose of harassing the Defendants and retaliating against them for supporting a stay of Mr. Whitman's 1992 default judgment against BMT. Although the Defendants tell a long and bizarre story concerning the animosity and paranoia of Mr. Whitman towards them, the Defendants do not provide any proof of Mr. Whitman or Mr. Marin having a subjec-

tive and malicious purpose for filing their claim nor an intention to harass.

However, the Court notes that an improper purpose may be inferred from the Plaintiffs' complete lack of a factual and legal basis for bringing a claim. *See Sussman,* 56 F.3d at 458, ("The court is not to 'delve into the attorney's subjective intent' in filing the paper, but rather should assess such objective factors as ... whether [the papers] lacked any legitimate purpose. Findings on these points would suffice to support an inference of an improper purpose.") *citing,* William W. Schwarzer, *Sanctions Under the New Federal Rule 11: A Closer Look,* 104 F.R.D. 181, 195 (1985). As discussed above, the Plaintiffs' claims clearly are without merit and lack any legitimate purpose. Therefore, in light of the circumstances surrounding their submission, this Court finds that the Plaintiffs' claims were filed for the improper purpose of harassing the Defendants.

In addition, the Court finds that the Plaintiffs' Fed.R.Civ.P. 59 motion supports an inference of improper purpose. The Plaintiffs' motion pursuant to Fed.R.Civ.P 59 to alter or amend the Court's Order dated April 25, 1996, which dismissed the Plaintiffs' claims against the Defendants was clearly frivolous, unwarranted, and malicious. The Court's Order outlined at length the deficiencies in the Plaintiffs' claims. Yet, the Plaintiffs, with notice from the Court that their claim was unsubstantiated by fact or law, continued to pursue their claims. The Plaintiffs stated that the grounds under which the Court should have altered or amended its prior Order were that, *inter alia:* the Court was partial toward the Defendants, the Court did not consider evidence supplied by the Plaintiffs, and the Court committed an impropriety relating to some unspecified relationship between Defendant Bares and the Court.

The Plaintiffs did not point to any errors in the law which the Court had overlooked. Moreover, they did not show a change in the existing law or new evidence which was not previously available. *See Hester Industries Inc. v. Tyson Foods, Inc.,* 160 F.R.D. 15, 16 (N.D.N.Y.1995) (requirements for a claim to alter or amend pursuant to Rule 59). Therefore, the Court finds that the Plaintiffs' motion pursuant to Rule 59 was filed for the improper purposes of needlessly increasing litigation costs, maliciously attacking the ethical principles and competence of this Court, and, in general, harassing the Defendants.

### D. Sanctions

#### i. Monetary Sanctions

Fed.R.Civ.P. 11 states that "[a] sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated ... Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2)." Fed.R.Civ.P. 11(c)(2) and 11(c)(2)(A):

The Defendants have asked for attorney's fees in the amount of approximately $15,000. This amount is based 104.6 hours at $125/hr spent in defense of Plaintiffs' claims the expectation of more than 120 hours in prosecuting this Rule 11 claim.

The rule in the Second Circuit is that attorney's fees should be calculated according to the prevailing rates in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Gray v. Millea,* 892 F.Supp. 432, 438 (N.D.N.Y.1995). Mr. Dugan's hourly rate of $125 is a reasonable rate for this community given the nature of the services provided.

The Court finds that Mr. Whitman and Mr. Marin are jointly and severally liable for the fees of Mr. Dugan for the defense of the Plaintiffs' claims, the Plaintiffs' Rule 59 motion dated May 9, 1996, and the Defendants' prosecution of their Rule 11 claim. Such fees amount to the following:

|     |     |     |
| --- | --- | --- |
| (a) | 104.6 hours at $125/hr = | $13,075.00 |
| (b) | Miscellaneous fees = | $      78.10 |
| (c) | Less retainer of $1000 paid by each defendant = | ($  6000.00) |
| (d) | Total Due Mr. Dugan = | $  7153.10 |

The Court also finds Mr. Whitman and Mr. Marin jointly and severally liable for the payment of $1,000 to each of the Defendants Emmerich Bares, Jacob Weber, Lloyd Harrison, S. Paul Jones, G. Bernard Freer and Thomas Barbour, as reimbursement for the expenses of retaining Mr. Dugan's services. Thus, the total amount imposed by the Court at this time amounts to $13,153.10.

### ii. Non–Monetary Sanctions

■ Fed.R.Civ.P. 11(c) states that the Court may impose any appropriate sanction. This has been interpreted to include compulsory legal education, *LaVigna v. WABC Television, Inc.*, 159 F.R.D. 432 (S.D.N.Y.1995), requiring leave of the Court before filing additional papers, *Fariello v. Campbell*, 860 F.Supp. 54 (E.D.N.Y.1994), and requiring an attorney to write clearly and in his own handwriting the legal provisions which he violated, *Curran v. Price*, 150 F.R.D. 85 (D.C.Md.1993).

### a. Sanctions in Regards to Mr. Marin

Mr. Marin signed every paper submitted to this Court and therefore has a duty to conduct a reasonable inquiry into the propriety of the claim, both factually and legally. He was notified on March 13, 1996, 21 days prior to the Defendants' filing of their Rule 11 motion for sanctions, filed on April 29, 1996, that he should discontinue the action before the Court on the basis that it was meritless. This provided Mr. Marin ample time to withdraw or amend the claim. Mr. Marin failed to withdraw or amend the claim. Therefore, Mr. Marin was allowed the "safe harbor" provision in accordance with Rule 11, yet failed to take advantage of such provision. *See* Fed.R.Civ.P. 11, Advisory Committee Notes to 1993 Amendments. Additionally, Mr. Marin filed a motion pursuant to Fed.R.Civ.P. 59, on May 9, 1996, after the Plaintiff's has moved for sanctions. Therefore, it is clear that Mr. Marin violated Fed.R.Civ.P. 11.

### b. Mr. Whitman

Mr. Whitman signed the initial complaint filed on October 13, 1995. This Court may impose sanctions on attorneys, law firms or parties. Fed.R.Civ.P. 11(c). For the reasons herein, it is apparent that Mr. Whitman's intention in filing the claim was to harass the Defendants. A represented party can be sanctioned for bringing claim for an improper purpose. Fed.R.Civ.P. 11.

Additionally, it appears to this Court that Mr. Whitman falsely lead Mr. Marin to believe certain facts which were true as to the actions of the Defendants and himself. While it is the duty of the attorney to make a reasonable inquiry into the facts of a claim, it is also the duty of a represented party not to color the facts of the case or mislead their attorney as to such facts. This is especially true when the represented party attests to the factual validity of the claim by signing it. Therefore, this Court finds that Mr. Whitman violated Fed.R.Civ.P. 11.[8]

The Court will require, as a necessary non-monetary penalty, Mr. Marin and Mr. Whitman to seek leave from the Court, by written request, before filing any papers with the Court relating to this matter, with the exception of any papers needed to defend against BMT's or the Defendants' motions to vacate Mr. Whitman's 1992 judgment.

## V. CONCLUSION

For the foregoing reasons, the Court hereby GRANTS the Defendants' motion for sanctions pursuant to Fed.R.Civ.P. 11, in the amount of $13,153.10, and ORDERS that Mr. Marin and Mr. Whitman shall seek leave from the Court, by written request, before filing any papers with the Court relating to this matter, with the exception of any papers needed to defend against BMT's or the De-

---

**8.** The Court notes that it is aware that Rule 11 does not permit sanctions to be awarded against a represented party for a violation of subdivision (b)(2). Fed.R.Civ.P. 11(2)(A). Mr. Whitman is not being sanctioned because of a Rule 11(b)(2) violation but for signing and submitting Court papers for the purpose of harassing the Defendants in contravention of Rule 11(b)(1).

fendants' motions to vacate Mr. Whitman's 1992 judgment.

IT IS SO ORDERED.