593 F.2d 884
 UNITED STATES of America, Plaintiff-Appellee,
v.
5.96 ACRES OF LAND, more or less, situated in Skamania
County, State of Washington, Knappton Towboat Company, a
corporation, and the State of Washington, Department of
Natural Resources, Defendants-Appellants.
 Nos. 77-1557, 77-2215.
 United States Court of Appeals,
Ninth Circuit.
 March 22, 1979.
 
 J. Lawrence Coniff, Jr., Asst. Atty. Gen. (argued), Olympia, Wash., Robert M. Schaefer (argued), Vancouver, Wash., for defendants-appellants.
 Jacques B. Gelin, Atty. (argued), Dept. of Justice, Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT and ANDERSON, Circuit Judges, and TAKASUGI,* District Judge.
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 To expedite completion of the Bonneville Second Powerhouse Project, the United States filed this action seeking flowage easements and condemnation of certain lands adjacent to the Columbia River. Appellant Knappton Towboat Company (Knappton) leases aquatic lands from the State of Washington (the State). Pursuant to these leases, Knappton has constructed pilings, dolphins, and dikes in and along the waters near the juncture of the Wind and Columbia Rivers. The district court granted the United States partial summary judgment against Knappton, ruling that no compensation was due for damages that the proposed enlargement of the existing dam would cause to the structures built by Knappton. The court reasoned that since these structures were below the river's ordinary high-water mark and the permits issued by the Army Corps of Engineers authorizing their construction were revocable at will, the United States' dominant navigational servitude precluded Knappton's claim for compensation.
 
 
 2
 The district judge certified an interlocutory appeal. 28 U.S.C. § 1292(b). We affirm the judgment against Knappton and dismiss the State's appeal.
 
 I. FACTS
 
 3
 For a small annual rent the State of Washington leases to Knappton aquatic lands located immediately upstream from the Bonneville Dam. Knappton built various pilings, dolphins, and dikes on the leased lands for timber storage. Completion of the Second Powerhouse Project will raise the water level behind the dam thereby weakening the structures Knappton has already built. To preserve them, Knappton must rebuild the structures at considerable expense.
 
 
 4
 Knappton contends this constitutes a compensable taking of private property under the fifth amendment. The State's claimed loss is predicated on an anticipated decrease in rental value of its aquatic lands.[1]
 
 II. PROCEEDINGS
 
 5
 The United States filed its Complaint in December 1974. The State and Knappton filed Notices of Appearance in January 1975. The United States moved for partial summary judgment in July 1976, but limited its motion to Knappton's claim. Both Knappton and the State filed memoranda in opposition to the motion. The United States then filed a supplemental memorandum in support of partial summary judgment and again addressed its argument only to Knappton's claim for compensation for injury to the physical structures.
 
 
 6
 In a Memorandum and Order filed November 19, 1976, the district court granted partial summary judgment, ruling that the United States had established, as a matter of law, that the Second Powerhouse Project served a navigational purpose, and therefore no compensation was due. The court Excluded from its ruling the State's claim for compensation:
 
 
 7
 "The court would emphasize that the decision reached here is limited to the facts of this case. The collateral issue raised by the State of Washington, in a case not part of this motion and relating to the river bottom, has not been considered." (R. 165)
 
 
 8
 The Order also specified that the court would certify an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), "should either party so desire."
 
 
 9
 Knappton moved the court for certification, and the court entered an order certifying this appeal (R. 167). Knappton then filed a Notice of Appeal and a Cost Bond on Appeal (R. 168-69). The State did not file a notice of appeal or a cost bond, nor did it join in Knappton's motion for certification.[2]
 
 
 10
 Both Knappton and the State petitioned this court for leave to file an interlocutory appeal. Neither Petition clearly explains the procedural background of the State's attempt to appeal. A motions panel of this court granted both Knappton and the State leave to appeal. All parties then submitted briefs and participated in oral argument.
 
 III. APPEAL OF THE STATE OF WASHINGTON
 
 11
 Although a motions panel did grant the State's Petition, we are free to reconsider its standing on appeal. United States v. Emens, 565 F.2d 1142, 1144 n.2 (CA 9 1977); See United States v. Patrick, 532 F.2d 142, 147 (CA 9 1976).
 
 
 12
 The State argues that the district court's ruling that the Bonneville Second Powerhouse Project has a navigational purpose will effectively control the outcome of its claim for compensation. Therefore, the State concludes, it is a proper party to this interlocutory appeal. The district judge apparently disagreed: he specifically reserved for separate consideration the effect of the navigational servitude on the State's claim. Although the State's argument is logical, it is premised on the belief that the district court's ruling and this appeal will establish the navigational servitude as the law of the case.
 
 
 13
 For reasons discussed Infra, we do not reach the navigational servitude issue in considering the appeal of Knappton. We decide Knappton's appeal on another ground. Thus, the State and Knappton (with respect to other claims for compensation) will be unaffected by this appeal, and they may further develop a factual record and address further arguments to the district court should the United States again assert the navigational servitude as a bar to just compensation.
 
 
 14
 The appeal of the State of Washington is dismissed. See Libby, McNeill, and Libby v. City National Bank, 592 F.2d 504, slip op. 3918 at 3926, # 75-3218 (CA 9, Nov. 28, 1978) ("A party may appeal only to protect its own interests, and not those of a coparty.") Insofar as its briefs are pertinent to the issues raised by Knappton, we treat the State as Amicus curiae.
 
 
 15
 IV. THE APPEAL OF KNAPPTON TOWBOAT CO.
 
 
 16
 Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, expressly forbids the construction of any structure in navigable waters unless authorized by the Secretary of the Army.[3] The United States alleges that the structures built by Knappton were authorized by permits that are revocable at will[4] and therefore Knappton has no property interest cognizable under the fifth amendment.
 
 
 17
 Knappton points out that the permits are not included in the record. Copies are included in the record, and Knappton has never alleged that permits were not obtained or that the copies inaccurately or incompletely state the attendant conditions. In fact, Knappton's Memorandum in Response to plaintiff's Motion for Summary Judgment (R. 38) implicitly admits that permits were obtained. Even in its briefs to this court, Knappton has not denied that permits were obtained. Despite the asserted deficiency in the record, Knappton's attempt to raise this phantom issue of fact comes too late.
 
 
 18
 Moreover, if no permits had been obtained, the structures would be unlawful, and their removal would not require compensation.
 
 
 19
 In the alternative, Knappton contends that issuance of the permits cannot be conditioned on waiver of its fifth amendment right to compensation for damages to the structures. There are two variants to Knappton's contention, one directed to each of the two pertinent permit clauses (see n.4, Supra ).
 
 A.
 
 20
 The first variant is that the permits grant Knappton a property right for which it must be compensated, unless the navigational servitude applies. Cf. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (six justices held procedural due process criteria applicable in determining whether good cause existed for termination of federal employee). This misconstrues the effect of the permit: the permit granted Knappton a mere license to build and maintain these structures.
 
 
 21
 The permits expressly negate the conclusion that the permit holder received any property right. (E. g., "(T)his instrument does not convey any property rights either in real estate or material." R. 84.) In United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913), the power company had built similar structures pursuant to a revocable permit. The Court denied any compensation to the power company:
 
 
 22
 "That it did not (by reason of the permit) acquire any right to maintain these constructions in the river (any) longer than the government should continue the license needs no argument." 229 U.S. at 68, 33 S.Ct. at 674.
 
 
 23
 This court has held that comparable permits issued for maintaining outdoor signs along the nation's highways do not require compensation when revoked. In Ryan Outdoor Advertising, Inc. v. United States, 559 F.2d 554 (CA 9 1977), the panel concluded that once the permits were revoked, there was no longer any interest to be compensated. We find no reason to distinguish these cases.
 
 
 24
 Although these permits were not revoked, we agree with the district court that the effect was identical:
 
 
 25
 "The direct language of the permit itself . . . is evidence that (Knappton) knew the government could require removal . . . and that it was acquiring no property interest. It would be an anomaly to argue that the government can require the removal of structures within the river without payment of compensation, yet damage done to the same structures by the exercise of the same inherent rights must be compensated." R. 164-65.
 
 
 26
 Cf. United States v. Fuller, 409 U.S. 488, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) (revocable grazing permits could not be considered in determining value of ranch land though permits had not been revoked). This court has impliedly recognized this fact. In a condemnation action, this court rejected evidence of the land's value as a port site even though permits had been obtained and may have actually been used, and never revoked, to construct improvements on a navigable river. United States v. 87.30 Acres of Land, 430 F.2d 1130 (CA 9 1970). The permits were revocable at will. We agree with their conclusion:
 
 
 27
 "This type of permit is not such a vested property right as, on termination, requires payment of just compensation under the Fifth Amendment." 430 F.2d at 1133.
 
 
 28
 Even if Knappton's conclusion that the permits are conditioned on waiver of its right to compensation is correct, the Supreme Court's analysis in United States v. Appalachian Electric Power Co., 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940), indicates the condition is constitutional. The Court upheld the validity of a condition in a dam license that allowed the United States to acquire the dam in the future for less than fair market value. The Court also stated that the licensee could be required to convey existing riparian rights to the United States at a reduced price in order to secure the right to build a dam, even though payment of full value would be required for these same rights if the government built the dam itself.[5]
 
 B.
 
 29
 Knappton next contends that the exculpatory clause for damages caused by future government operations is invalid.
 
 
 30
 This court has implicitly rejected the same argument in Pacific Northwest Bell Telephone Co. v. United States, 549 F.2d 1313 (CA 9), Cert. denied, 434 U.S. 820, 98 S.Ct. 62, 54 L.Ed.2d 76 (1977) (hereinafter Bell ). In that case, the permittee contended the condition[6] conflicted with the waiver of sovereign immunity contained in the Public Vessels Act and the Suits in Admiralty Act. Although the argument here is couched in constitutional and public policy terms, the court's reasoning is nonetheless applicable.
 
 
 31
 In Bell, the telephone company had been granted a permit to lay a cable underneath Lake Washington. The permit exculpated the United States from liability for damages that might be caused to the cable by future government operations. While setting buoys for a regatta, a Coast Guard vessel fouled the cable. The telephone company sued the United States for damages; the theory of liability was negligence.
 
 
 32
 The court upheld the validity of the exculpatory clause. The telephone company had asserted that the condition violated the policy embodied in the statutes waiving sovereign immunity by unfairly favoring the United States solely because of its sovereignty. The court responded:
 
 
 33
 "This does not serve to place the United States in a position more favorable than that which a private person would occupy . . .. The private person hypothesized in these circumstances is the owner of land from whom an easement is sought by one having no power to compel a grant or demand passage. The question is whether such a private person, in his power to attach conditions to an easement he was not otherwise obliged to grant, is less favored in the law than the United States is here held to be. We do not perceive that he is.
 
 
 34
 "Finally, we note that holding clause (g) to be unenforceable would do more than relieve Bell of a condition it regards as improper. It would, in effect, operate to render persons incompetent to secure desired benefits by way of contract, since they could no longer effectively commit themselves to conditions they may be entirely willing to assume in order to obtain their permit."
 
 
 35
 549 F.2d at 1317.
 
 
 36
 The State of California[7] argues that the court's analogy is inapposite because the conditions, in both instances, were imposed, not bargained for at arm's length. This argument, however, denies the United States the power to place reasonable conditions on private use of public waterways in the same manner as private persons may condition use of their real or personal property. Actually, the government is more constrained. Unlike a private individual, government actions must reasonably further a valid public purpose. See United States v. River Rouge Improvement Co., 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339 (1926); Scranton v. Wheeler, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126 (1900). An individual property owner may refuse to grant an easement or license as he pleases or condition the grant on any lawful grounds.
 
 
 37
 In Boston Edison Co. v. Great Lakes Dredge & Dock Co., 423 F.2d 891 (CA 1 1970), the permittee argued that the exculpatory clause violated public policy, relying primarily on Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). Bisso holds that a tugboat company cannot contractually insulate itself from liability for damages caused by its own negligence when towing another vessel. The court in Boston Edison distinguished Bisso :
 
 
 38
 "Finally, Edison argues that Clause (g) should be struck down as violative of public policy, relying primarily on Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955). Bisso, however, enunciates a rule of contract law and arises in a context in which the Supreme Court ruled, in substance, that where two parties to a contract are of unequal bargaining power it is against public policy for the stronger of the two parties to force the weaker to accept a clause exculpating the stronger from liability for its own negligence.
 
 
 39
 "The instant situation is totally distinguishable from Bisso in that Clause (g) does not appear in a contract. The permit in question was neither negotiated for nor sold, but was issued by the Secretary of the Army acting under discretionary authority clearly conferred on him by 33 U.S.C. sec. 1 et seq. If the insertion of such a clause under authority given to the Secretary be now thought to be against public policy, the entity enunciating that a policy clearly contained in a statutory grant of power to the Secretary is no longer held in favor should be the Congress and not this court."
 
 
 40
 423 F.2d at 897. We also note that absent here is the special relationship between a tow for hire and a helpless vessel that the court expressly relied on in Bisso.[8] 349 U.S. at 91, 75 S.Ct. 629. Compare The Steamer Syracuse, 79 U.S. (12 Wall.) 167, 20 L.Ed. 382 (1870) With Sun Oil Co. v. Dalzell Towing Co., Inc., 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311 (1932).
 
 
 41
 We find the panel's analogy in Bell apposite and follow its reasoning. We hold that "(t)he effect of the condition here imposed is simply to place upon the permittee the risk of damage to the permitted structure." Id. at 1316. Irrespective of the condition's validity in a contract setting, it is valid when the United States is discharging its "special duties and responsibilities" over navigable waters.
 
 
 42
 The State of California also asserts that Bell should be distinguished because Bell relies on the fact that the Coast Guard was serving a navigational purpose. We disagree. The opinion expressly disavows reliance on the United States' navigational servitude. 549 F.2d at 1317 n.5. Both the permit here and the one in Bell conditioned the license on the permittee assuming the risk of damage caused by government actions in the public interest.
 
 
 43
 Finally, the State of California invites us to distinguish Bell on the ground that Bell involved a tort action whereas here the government action involves an alleged taking of private property without compensation. We decline. In Bell, the damage was caused by the government's negligence;[9] by definition, then, the damage was not necessary to further the public interest. Here, the damage was an unavoidable consequence of a project undertaken to further the public good.[10] The policy supporting insulating the government from liability is therefore much stronger in the case at bar.
 
 
 44
 Finally, we emphasize that, although the district court relied primarily on the navigational servitude, our decision is in keeping with its conclusion regarding the effect of the permits. The question whether this project serves a navigational purpose may be considered by the district court when ruling on the State's claim for compensation. This, again, is in keeping with the district court's initial ruling.
 
 
 45
 The appeal of the State of Washington is DISMISSED. The judgment is AFFIRMED, and the case is REMANDED for further proceedings.
 
 
 
 *
 The Honorable Robert M. Takasugi, United States District Judge for the Central District of California, sitting by designation
 
 
 [1]
 For purposes of this appeal, we assume the alleged damage could, in other circumstances, constitute a taking of private property. Thus we do not decide whether the anticipated rise in pool level and consequent weakening of these structures is a sufficient encroachment on private property to constitute a "taking" under the fifth amendment. Similarly, we do not decide whether diminution in rental value can constitute a "taking." Cf. Gibson v. United States, 166 U.S. 269, 275-76, 17 S.Ct. 578, 41 L.Ed. 996 (1897) (alternative ground); Brothers v. United States, --- F.2d ----, slip op. 459, # 77-3044 (C.A.9, Feb. 8, 1979) ("there is a taking of property when government action directly interferes with or substantially disturbs the owner's use and enjoyment of the property.")
 
 
 [2]
 F.R.A.P. Rule 5, 28 U.S.C.A., provides:
 "Appeals by Permission Under 28 U.S.C. § 1292(b)
 (d) If permission to appeal is granted the appellant shall file a bond for costs . . .. A notice of appeal need not be filed.
 
 
 [3]
 " § 403. Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in
 The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."
 33 U.S.C. § 403.
 
 
 [4]
 "(T)his permit may be revoked by authority of the Secretary of the Army . . . if the Secretary determines that, under the existing circumstances, such action is required in the public interest." Copy of Permit, R. 84
 The permits also contained an exculpatory clause:
 "(j) (T)he United States shall in no way be liable for any damage to any structure or work authorized herein which may be caused by or result from future operations undertaken by the Government in the public interest." Copy of Permit, R. 85.
 Although Knappton contends the present project does not serve a navigational purpose, it does not contend that the project fails to serve a legitimate public interest. Knappton does contend that the Secretary has expanded his authority by changing the wording of these conditions. We have examined the wording in all the permits submitted to the court, including the ones attached to Knappton's petition for leave to file this appeal and in the regulations promulgated by the Secretary of the Army. In light of the facts and issues raised in this appeal, the variations in wording are immaterial. In each, the government's power to revoke and its exculpation from liability are clearly stated. See n.6, Infra.
 
 
 [5]
 This case also puts to rest Knappton's contention that conditions unrelated to navigation are invalid Per se. See also Zabel v. Tabb, 430 F.2d 199 (CA 5 1970), Cert. denied, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971) (Secretary must consider effects other than navigation and may refuse a permit under the Rivers and Harbor Act on conservation grounds). And Knappton's assertion that the Secretary exceeded his authority in imposing these conditions is unsupported by case law. See id. at 207
 
 
 [6]
 The condition reviewed in Bell was differently worded, but essentially the same as the condition in the permits issued to Knappton:
 "That the United States shall in no case be liable for any damage or injury to the structure or work herein authorized which may be caused by or result from future operations undertaken by the Government for the conservation or improvement of navigation, or for other purposes, and no claim or right to compensation shall accrue from any such damage."
 549 F.2d at 1315. Compare 33 C.F.R. § 209.130(c)(2)(vii) (1974) With 38 Fed.Reg. 12217 (1973) And 33 C.F.R. § 209.120(g) (1976).
 
 
 [7]
 We granted the State of California leave to file a brief as Amicus curiae
 
 
 [8]
 Any special relationship that exists between the United States and potential users of the nation's waterways is assured by the requirement that the United States must always act reasonably and in the public interest
 
 
 [9]
 The district judge in Bell had found that the Coast Guard was negligent Per se. 549 F.2d at 1316
 
 
 [10]
 In Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), the court grounded its decision on the need:
 "(1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains." (footnote omitted) 349 U.S. at 91, 75 S.Ct. at 632, 633.
 Upholding the validity of the instant clause under these facts jeopardizes neither of these policies. As noted in the text, negligence is not involved. There can be no overreaching in bargaining when, as here, the government grants a gratuitous license.