**COLUMBIA GULF TRANSMISSION COMPANY, Plaintiff,**

v.

**UNITED STATES of America and Col. Gary W. Wright, Defendants.**

Civil Action No. 5:95–cv–121 BrN.

United States District Court, S.D. Mississippi, Western Division.

March 19, 1997.

Antonio J. Rodriguez, Mary Campbell Hubbard, Eric P. Halber, Rice Fowler, New Orleans, LA, for Plaintiff.

John A. Meynardie, U.S. Attorney's Office, Jackson, MS, for Defendants.

## MEMORANDUM OPINION

BRAMLETTE, District Judge.

This matter is before the Court on the Defendants' (United States of America and

Col. Gary W. Wright, sued in his official capacity) motion for dismissal or summary judgment pursuant to Rules 12(b)(6), 12(b)(1), and 56(b). The Defendants argue that the Court is without subject matter jurisdiction and that the complaint fails to state a claim upon which relief can be granted. Also before the Court is the plaintiff's motion for sanctions and attorney's fees and the defendant's motion for sanctions and attorney's fees (docket entry nos. 35 and 37). Having reviewed the motions, memoranda, supporting documents, and law, the Court finds as follows:

## BACKGROUND

This action was brought against the United States alleging negligence by the United States Army Corps of Engineers ("Corps") which caused the plaintiff's, Columbia Gulf Transmission Company ("Columbia Gulf"), pipelines crossing the Mississippi River to burst.

Columbia Gulf is part of the Columbia Gas System, a natural gas utility serving the Middle Atlantic states. In May 1960, the Corps issued Columbia Gulf a permit authorizing it to lay two 24-inch natural gas pipelines, spaced about 30 feet apart, crossing the Mississippi River. Construction of the pipelines was completed in October 1960. According to the plaintiff, the pipelines were buried about thirty feet below the river bottom.

In the early 1970's, the Corps undertook to build channel stabilization projects along the Mississippi River to prevent flooding and make the Mississippi River more navigable. One of the improvements authorized as part of this program was the construction of dikes in the river near Corregidor, Mississippi, a point just upstream from Columbia Gulfs pipelines. Construction of the Corregidor Dikes was completed in early 1977.

In June 1984, personnel from Columbia Gulf became concerned about the effects of bank erosion in the area of its pipeline crossing. Columbia Gulf officials met with Corps representatives and informed them that the bank line had receded to within 500 feet of its pipeline valve system. Columbia Gulf asked the Corps to extend the Sarah Island-Opossum Point Revetment near the point of the erosion.

In June 1985, following a low-water inspection of the river, the Corps decided to extend the revetment downstream to the area of the pipeline crossing. The Corps completed the extension by 1986. According to Columbia Gulf, the extension stopped erosion of the right descending bank of the river but did not extend far enough into the river to protect the river bottom from erosion. The river bottom covering Columbia Gulfs pipelines remained exposed to the current, and the change in river flow conditions caused by the Corregidor Dikes eventually uncovered the pipelines. As a result, the pipelines suffered fatigue failure and had to be replaced at a cost of approximately $6,000,000.

In August 1995, Columbia Gulf filed a complaint naming the Corps and Wright as defendants. The complaint alleges that the Corps was negligent in designing and constructing the dikes and revetments upstream from Columbia Gulfs pipes and that this negligence caused its pipes to burst. Columbia further alleges that the activities of the Corps resulted in the constructive revocation of its 1960 permit without procedural due process and brought about a compensable taking under the Fifth Amendment.

In November 1995, the Defendants filed a motion to dismiss or for summary judgment. In a Memorandum Opinion and Order dated September 30, 1996, this Court granted the motion to dismiss the Fifth Amendment claim for lack of subject matter jurisdiction. Exclusive jurisdiction for claims against the United States exceeding $10,000 and founded upon the Constitution is vested in the Federal Court of Claims. *See e.g. Bowles v. United States Army Corps of Eng'rs*, 841 F.2d 112 (5th Cir.1988); *Amoco v. Hodel*, 815 F.2d 352 (5th Cir.1987). The Court denied the motion to dismiss the negligence claim without prejudice and allowed the defendants to re-urge their motion and request oral argument. In November 1996, the defendants re-urged their motion as to the negligence claim and oral argument was scheduled and heard February 24, 1997.

.. no.

**1458**

## LEGAL STANDARD

### Motion to Dismiss Under Rule 12(b)(6)

▉ A Rule 12(b)(6) motion is disfavored, and it is rarely granted. *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir.1986); *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir.1981). In deciding the motions to dismiss, the facts alleged in the complaint are taken as true, and the Court must draw all reasonable inferences in favor of the plaintiffs. *C.C. Port, Ltd. v. Davis–Penn Mortgage Co.*, 61 F.3d 288, 289 (5th Cir. 1995). The complaint should not be dismissed unless it appears beyond doubt that the plaintiffs can prove no set of facts which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41,45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). "However, 'the complaint must contain either direct allegations on every material point necessary to sustain a recovery ... or contain allegations from which an inference fairly may be drawn that evidence of these material points will be introduced at trial.'" *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir.1995) (quoting 3 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d 1216, pp. 156–59.).

"[Where] matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." FED.R.CIV.P. 12(b); *Murphy v. Inexco Oil Co.*, 611 F.2d 570, 573 (5th Cir.1980); *Young v. Biggers*, 938 F.2d 565, 568 (5th Cir.1991).

Because the parties have submitted and the Court has considered materials outside the pleadings, the Court will treat the motion of the United States as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure states in relevant part that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. FED.R.CIV.P. 56(c). The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Moore v. Mississippi Valley State Univ.*, 871 F.2d 545, 549 (5th Cir.1989); *Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1122 (5th Cir.1988).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

## DISCUSSION

At issue herein is whether the government acted negligently in building the Corregidor dikes and the Sarah Island–Opossum Point revetment extension and whether the government can be liable for any alleged negligence. The government asserts three defenses. First, it claims sovereign immunity under the Flood Control Act. Second, it claims sovereign immunity under the discretionary function exception to governmental liability. Finally, it claims that it is shielded from liability as a result of an exculpation clause contained in Columbia Gulfs permit. Whether this suit lies under the Federal Tort Claims Act or the Suits in Admiralty Act, the legal analysis is the same.

### The Exculpation Clause in the Columbia Gulf Permit

The defendants contend that the permit which allowed Columbia Gulf to lay its pipes

across the Mississippi River contained an exculpation clause which precluded governmental liability for damage or injury.

Clause (g) of the permit contains the following language:

> [T]he United States shall in no case be liable for any damage or injury to the structure or work herein authorized which may be caused by or result from future operations undertaken by the Government for the conservation or improvement of navigation, or for other purposes, and no claim or right to compensation shall accrue from any such damage.

■ The plaintiff contends that the United States violated Columbia Gulfs procedural due process rights, and as a result, the exculpation clause in the permit is unenforceable. To reach this conclusion, Columbia Gulf argues that clause (g) of the permit can only be read in conjunction with clause (f) of the permit. Clause (f) requires notice and a hearing before the United States can validly exercise its navigational servitude at Columbia Gulfs expense. Clause (f) of the permit provides:

> That if future operations by the United States require an alteration in the position of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army, it shall cause unreasonable obstruction to the free navigation of said water, the owner will be required upon due notice from the Secretary of the Army, to remove or alter the structural work or obstructions caused thereby without expense to the United States, so as to render navigation reasonably free, easy, and unobstructed; and if, upon the expiration or revocation of this permit, the structure, fill, excavation, or other modification of the watercourse hereby authorized shall not be completed, the owners shall, without expense to the United States, and to such extent and in such time and manner as the Secretary of the Army may require, remove all or any portion of the uncompleted structure or fill and restore to its former condition the navigable capacity of the watercourse. No claim shall be made against the United States on account of any such removal or alteration.

According to Columbia Gulf, clauses (f) and (g) must be read together to give meaning to the due process requirements of clause (f). Inasmuch as clause (f) requires notice and a hearing, clause (g) requires notice and a hearing. Since the Corps drafted the permit language, Columbia Gulf contends that any ambiguities must be construed against the drafter. *Semmes Motors v. Ford Motor Co.*, 429 F.2d 1197, 1207 (2nd Cir.1970).

The Court does not find the permit language to be ambiguous. The two clauses relate to two distinct types of situations. In one situation, due process is required. In the other, it is not.

Clause (f) involves the United States' exercise of its navigational servitude. That clause gives the United States the right to require Columbia Gulf to remove or alter its pipeline if the United States finds doing so necessary to render navigation on the Mississippi River reasonably free, easy, and unobstructed. Any removal or alteration must be made without expense to the United States. Before ordering the removal or alteration of the pipeline, however, the United States must provide due process to Columbia Gulf.

Clause (g), on the other hand, exculpates the United States for any future operations the government might undertake resulting in damage or injury to Columbia Gulfs pipelines. The clause clearly states that "no claim or right to compensation shall accrue from any such damage." Clause (g) does not contain the same notice requirements found in clause (f).

The clauses are independent of each other, and both can be given meaning without reference to the other. Once the pipeline is in place, clause (f) requires notice before the United States may mandate its alteration or removal. If, however, the United States, upon its own initiative, undertakes a project to conserve or improve navigation of the waterway, it is not liable to Columbia Gulf for any damage or injury which might result from that project.

The Corregidor Dike construction and the Sarah Island–Opossum Point revetment clearly fall within clause (g). The projects were undertaken by the Corps to minimize

scouring of the bank. As a result, scouring of the river bed occurred, and this eventually exposed the Columbia Gulf pipelines to the river's current. But no affirmative act was undertaken to require Columbia Gulf to alter or remove the pipelines as contemplated by clause (f).

Other courts have considered similar exculpation clauses and found them enforceable. In *Boston Edison Co. v. Great Lakes Dredge & Dock Co.*, 423 F.2d 891, 894, 896 (1st Cir.1970), the First Circuit found that identical exculpatory language precluded liability of the United States for negligence. In *Boston Edison*, the Corps of Engineers issued a permit to Boston Edison for the installation of cables under the Chelsea River. *Boston Edison*, 423 F.2d at 893. The permit contained a clause (g) identical to the one at issue in the case *sub judice*. The Corps subsequently entered into a contract with Great Lake Dredge & Dock Company to dredge the river in the vicinity of the cables. *Id.* In the course of dredging the river, the cables were damaged. *Id.* Boston Edison then sued the United States and Great Lakes. *Id.* The United States relied on the exculpation clause as a defense to the suit. *Id.* The First Circuit affirmed the lower court's decision to grant summary judgment and stated, "[W]e hold that the broad language of Clause (g) was intended to, and does, preclude liability of the United States for negligence if the insertion of the clause was within the powers validly delegated to the Secretary of the Army by Congress." *Id.* at 894. The First Circuit then went on to hold that the insertion of the clause was within the Secretary's discretionary powers. *Id.* at 896–97.

In *Consolidated Aluminum Corp. v. C.F. Bean Corp.*, 639 F.Supp. 1173, 1184 (W.D.La. 1986), the district court noted that Texaco, Inc., the owner of a pipeline, could not recover damages to its pipeline from the United States in light of clause (g) in a Corps of Engineers permit. The plaintiff, Consolidated Aluminum, filed suit against a dredging company and Texaco after a dredging barge broke the pipeline resulting in the termination of Consolidated Aluminum's natural gas supply. *Consolidated Aluminum*, 639

F.Supp. at 1175. Texaco then sued the United States through the Corps of Engineers contending that the Corps was liable. The Texaco pipeline permit contained exculpatory language in clause (g) identical to the language of clause (g) in the Columbia permit. *Id.* at 1176. The court found that the Corps could not be liable for damages to the Texaco pipeline. *Id.* at 1184. The court stated, "The courts of this nation have upheld the validity of this clause which disclaims liability on the part of the United States for any damage or injury to a structure authorized by a Corps of Engineers permit." *Consolidated Aluminum*, 639 F.Supp. at 1184 (citing *Boston Edison*, 423 F.2d 891); *Pacific Northwest Bell Tel. Co. v. United States*, 549 F.2d 1313 (9th Cir.1977), *cert. denied* 434 U.S. 820, 98 S.Ct. 62, 54 L.Ed.2d 76 (1977).

■ Columbia Gulf also alleges that the government's ability to limit liability under an exculpation clause applies only where the government permit is revocable at will. The plaintiff cites *United States v. 5.96 Acres of Land*, 593 F.2d 884 (9th Cir.1979), a case in which the clause was found to be enforceable. The plaintiff argues that a fair reading of that case indicates that the Government's ability to limit its liability under the exculpation clause is directly linked to its ability to revoke a permit at will.

In *5.96 Acres of Land*, the plaintiff argued that the exculpatory clause for damages caused by future government operations was invalid. *Id.* at 889. In that case, the government's proposed enlargement of a dam would cause structures completed by the plaintiff, a tow boat company, to be damaged and would require the plaintiff to rebuild the structures at considerable expense. *Id.* at 885–886. The Ninth Circuit upheld the clause noting that, "Irrespective of the condition's validity in a contract setting, it is valid when the United States is discharging its 'special duties and responsibilities' over navigable waters." *Id.* at 890. While the Ninth Circuit noted that the permit was revocable at will, that Court does not condition its finding that the exculpatory clause was valid on the revocable nature of the permit as the plaintiff herein contends. No court, including the Ninth Circuit, has confined the validity of

exculpation clauses to a revocable-at-will setting.

### The Flood Control Act

Even if the exculpatory language was deemed invalid, the plaintiff would not be able to survive the defendants' motion to dismiss inasmuch as the Flood Control Act provides immunity to the United States from the alleged negligence of the Corps. The construction of dikes and revetments are activities clearly associated with flood control.

At issue is whether the Flood Control Act of 1928, 33 U.S.C. § 702c, provides immunity for the United States from the alleged negligence of the Corps in building the dikes and revetments upstream from the Columbia Gulf pipelines. The Act provides: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place." 33 U.S.C. § 702c.

The defendants argue that the plaintiff cannot maintain this action inasmuch as the United States has not waived its sovereign immunity for damages resulting out of work the government conducts for flood control. The government argues that any activity such as the one undertaken by the Corps to build revetments and dikes relates to its flood control efforts. The defendants' position is that any relationship to flood control is sufficient to vest immunity in the government.

The plaintiff contends that the Flood Control Act does not apply due to the fact that the actions complained of were an attempt to improve navigation and not an effort to control flooding. The plaintiff argues that the immunity provision applies only if the primary purpose of the structures was flood control. Columbia Gulf avers that the primary purpose of the dikes and revetments was navigational, that the dikes and revetments bear little, if any, relationship to flood control, and that, therefore, the defendants are not immune from liability.

In *United States v. James,* 478 U.S. 597, 605, 608, 106 S.Ct. 3116, 3121–22, 92 L.Ed.2d 483 (1986), the Supreme Court noted that the immunity language in the Flood Control Act was broad and concluded that "Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the Government from 'any' liability associated with flood control."

The Fifth Circuit, in *Boudreau v. United States,* 53 F.3d 81 (5th Cir.1995), articulated its standard for identifying when the government was shielded from liability under § 702c of the Flood Control Act. The Court first chronicled the disagreement among the circuits regarding the application of § 702c. *Id.* at 83. The Ninth Circuit applies the "wholly unrelated" test; immunity is denied only in situations where an injury is "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization." *Id.* at 84 (quoting *Morici Corp. v. United States,* 681 F.2d 645, 647 (9th Cir.1982)). The Seventh Circuit grants immunity where an injury is "more likely" due to "activities or characteristics" of a flood control project. *Id.* (quoting *Bailey v. United States,* 35 F.3d 1118, 1124 (7th Cir.1994)). The Tenth Circuit does not apply the "wholly unrelated" test, but the Fifth Circuit did not define the test applied by its sister circuit. *Id.* The Fifth Circuit then opined that its analysis was fact-specific; "there must be a sufficient association between the actions complained of and flood control." *Id.*

In *Boudreau,* the Fifth Circuit held that the Flood Control Act immunized the United States from liability for alleged negligence by the Coast Guard Auxiliary. *Id.* at 86. In that case, the plaintiff took his boat out on a lake, and after experiencing trouble, called the Coast Guard for assistance. *Id.* at 82. The Coast Guard was assigned water safety patrol duties on the lake. *Id.* at 84–85. The Coast Guard arrived and secured a tow line to the plaintiff's boat. *Id.* at 82. The plaintiff was instructed to either lift anchor or cut the line. *Id.* While attempting to lift anchor, the anchor line broke free, hit the plaintiff, and caused him severe injury. *Id.* He filed a negligence suit against the government, and the government claimed immunity under the Flood Control Act. *Id.* Although the *Boudreau* plaintiff acknowledged that the lake was a flood control lake, he asserted that his

injuries were not "from or by ... flood waters." *Id.* at 82–83.

The Fifth Circuit, noting that its application and analysis of § 702c was fact-specific, concluded that there was a sufficient association between the Coast Guard's activities in rescuing the plaintiff and flood control. *Id.* at 84. The plaintiff's injury resulted from a boating accident on flood control waters involving the government's patrol of those waters. *Id.* at 86. Assuming that something more than management of a flood control project was required, the Court was confident that, based on the facts presented, the case "[met] the mark." *Id.*

■ Based on the facts presented, this Court concludes that there is a sufficient association between the Corps' activities and flood control to provide immunity for the United States pursuant to § 702c of the Flood Control Act. The Corregidor dikes and the Sarah Island–Opossum Point revetment have a nexus to flood control. The two projects were part of the Channel Improvement Feature of the Mississippi River and Tributaries Project. That project had two purposes: navigation and flood control, both of which were accomplished by the stabilization of the channel's alignment. (Dr. Phil Combs Aff., Def. Exh. B ).

In 1928, following the great flood in the Mississippi River Valley in 1927, Congress passed the Flood Control Act which committed the federal government to a program of flood control. The Act authorized channel stabilization and river regulation from Cape Girardeau, Missouri, to Head of Passes, Louisiana to prevent future floods. *Id.* at 83 n. 4; *1976 Environmental Impact Statement for the Mississippi River and Tributaries, Mississippi River Levees and Channel Improvement.* The Mississippi River & Tributaries Project is the continuation of the 1928 Act.

Channel stabilization has flood control purposes. A stable channel protects the foundations of levees, stabilizes the river for flood control purposes, and provides a dependable navigation channel in the river not less than 300 feet wide and nine feet deep. (Combs Aff., Def.'s Exh. B at para. 12, 14).

Dikes and revetments are important components of channel stabilization. Revetments are necessary to maintain project depths and widths, prevent serious bank recession, limit meandering, and fix the overall alignment of the main channel. (Combs. Aff., Def.'s Exh. B at 13). "[A] revetment that stops bank erosion maintains the channel for navigation and flood control purposes and protects the flood levees." (Combs Aff., Def.'s Exh B at 14). Dikes "establish and maintain a mid-bank low water trace within the major channel by aligning and contracting mid-bank and low water flows into a single channel. They also close off undesirable secondary chute channel and reduce dredging requirements." (Combs Aff., Def.'s Exh B at para 13.)

■ It is the opinion of this Court that the Corregidor dikes and the Sarah Island–Opossum Point revetment were flood control projects under the law. Authorization for these projects flows from the Flood Control Act of 1928 and the subsequent Mississippi River & Tributaries Project. In addition, the structures have an actual flood control purpose. The structures assist in channel stabilization, a feature necessary to protect levees, they aid in navigation, and preserve the river from floods. Any damage to the plaintiff's pipelines is causally related to flood control. The Corps' activities are associated with flood control, and the government has not waived its sovereign immunity under the Flood Control Act.

### The Discretionary Function

Assuming, *arguendo,* that the exculpatory language of the permit and the Flood Control Act do not shield the federal government from liability, the discretionary function exception to sovereign immunity would apply to immunize the Corps.

The defendants argue that this Court is without subject matter jurisdiction over this claim because the United States has not waived its sovereign immunity for actions based on the exercise or performance or failure to exercise or perform a discretionary function. The plaintiff argues that the defendants' conduct does not fit into the discretionary function exception.

The Federal Tort Claims Act subjects the federal government to liability for the tortious acts of its employees committed within the scope of their employment. 28 U.S.C. § 2672. The federal government remains shielded from liability, however, by the discretionary function exception codified at 28 U.S.C. 2680(a). That statute provides that the United States' waiver of sovereign immunity under the Act will not apply to:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). In *Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir.1995), the Fifth Circuit stated: "Although the [Suits in Admiralty Act] does not contain an express discretionary function exception to its waiver of sovereign immunity, we recognize that the FTCA's exception is 'implicit in private suits brought against the United States Government under the Suits in Admiralty Act.'" (citing *Wiggins v. United States Through Dep't of Army*, 799 F.2d 962, 966 (5th Cir. 1986)). Thus, the discretionary function limits the federal government's waiver of sovereign immunity whether the suit is brought under the FTCA or the SAA.

Actions which involve an element of judgment or choice and implicate legislative and administrative decisions grounded in social, economic, and political policy are shielded by the discretionary function exception. *United States v. Gaubert*, 499 U.S. 315, 322–23, 111 S.Ct. 1267, 1273–74, 113 L.Ed.2d 335 (1991). The Fifth Circuit explained the discretionary function exception in *Baldassaro:*

> The exception covers only acts that " 'involv[e] an element of judgment or choice;' " thus " 'it is the nature of the conduct, rather than the status of the actor,' that governs whether the exception applies." As the purpose of the exception is to " 'prevent judicial "second guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort,' " it " 'protects only governmental actions and decisions based on considerations of public policy.' "

64 F.3d at 208 (citations omitted). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324, 111 S.Ct. at 1274.

In *Gaubert*, the Supreme Court identified three different situations in which the discretionary function exception might come into play:

> [I]f a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation.... If the employee violates a mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy. On the other hand, if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

*Id.* at 324, 111 S.Ct. at 1274.

The defendant contends that the decision to build the Corregidor dikes and the Sarah Island–Opossum Point revetment, where to build them, and how to build them were an integral part of the Corps mission and involved the exercise of a discretionary function.

The first step in analyzing the discretionary function exception is to determine whether the United States violated a mandatory regulation. If the Corps violated a mandatory regulation, "there [is] no shelter from liability because there is no room for

choice and the action will be contrary to policy." *Id.*

■ The plaintiff alleges that the United States violated ER 1110–2–1200, paragraph 4(b), in building the Corregidor dikes because the United States did not have an approved design memorandum. The United States contends that it complied with the requirement. Corps compliance with the requirement is premised on LMVD Supplement 1 to ER 1110–2–1150, paragraph 27a. The plaintiff also alleges that the United States failed to comply with ER 1110–2–1150, paragraph 27d(1), which requires a more specific letter report and general plan for specific projects. The United States contends that its "Letter Report—General Plans" are in compliance with ER 1110–2–1150, paragraph 27d(1).

Corps regulation ER 1110–2–1200, paragraph 4(b), requires an approved design memorandum for the construction of civil works projects. The United States contends that its Master Plan serves as a design memorandum for the Mississippi River Project pursuant to LMVD Supplement 1 to ER 1110–2–1150, paragraph 27a. The supplement at paragraph 27a states:

> a. *Master Plan.* A Master Plan has been developed for all work required to complete the Channel Improvement Feature. This Master Plan serves as a General Design Memorandum and is to be continuously updated to be sure it reflects the latest river conditions. When revisions are required, the Districts will submit appropriate recommendations to the President, MRC.; ATTN: LMVED–C for approval.

A Master Plan was developed and continuously updated as required. The Corps obeyed this regulation by developing and updating a master plan. The Corps actions, therefore, are in furtherance of the policies which led to the promulgation of the regulation.

■ The plaintiff also contends that the Corps failed to comply with ER 1110–2–1150, paragraph 27d(1), which requires a specific letter report and general plan for specific projects. The United States argues that its "Letter Report—General Plans" complies

with ER 1110–2–1150, paragraph 27d(1). The "Letter Report—General Plans" was submitted to and approved by the Mississippi River Commission.

Paragraph 27d, ER 1110–2–1150, provides that certain documents will serve as feature design memorandums [sic] for all dike work, including in subparagraph (1) a letter report with general plans. Defendant's Exhibits C–1 and C–1a satisfy the feature design memorandum requirement. The letter report references ER 1110–2–1150, paragraph 27d(1), and states that the Corps is submitting these general plans for dike construction at Corregidor, Mississippi for review by the President, Mississippi River Commission, ATTN: LMVED–C. The general plans were approved by R.H. Resta, acting for the president of the Mississippi River Commission. The Corps has, therefore, satisfied this requirement.

■ Even if the regulations allowed employee discretion and were not mandatory, the Corps would be shielded from liability under the discretionary function exception.

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Id.* at 324–25, 111 S.Ct. at 1274–75.

■ Clearly, the nature of the actions taken in construction of the dikes and revetments on the Mississippi River are susceptible to policy analysis. The policy goals embodied in the Rivers and Harbors Act of 1899 and the Flood Control Act of 1928 were two-fold: to improve navigation on the Mississippi River and to control the catastrophic ef-

fects of a major flood. The plaintiff concedes that the decisions of the Mississippi River Commission to build the structures at issue are protected by the discretionary function exception, but the plaintiff argues that once the decisions were made, engineering and mathematical principles mandated the process for constructing the dikes and revetments.

This argument is without merit for two reasons. First, decisions about design and construction of navigational and flood control projects on the Mississippi River do not rest solely on mathematical calculations. *Id.* at 331, 111 S.Ct. at 1278. Design and construction of any project require discretion about a number of things. Economic discretion must be exercised so that the project comes within its allocated budget. Choices also must be made regarding appropriate construction materials to be used. The Corps must take into consideration the environmental impact of projects and must make decisions which will mitigate environmental harm along the waterway. Moreover, the project must be designed and constructed so as to minimize disruption of navigation on the Mississippi River, a major artery for commerce. All of these issues, and others which come into play, are grounded in social, economic, and political considerations.

The plaintiff's argument fails for a second reason. The plaintiff concedes that the Mississippi River Commission exercised discretion when it determined which projects it would undertake. In *United States v. Varig Airlines,* 467 U.S. 797, 820, 104 S.Ct. 2755, 2767–69, 81 L.Ed.2d 660 (1984), the Supreme Court held that where the acts of an agency were discretionary, the actions of the agency's employees in executing the program were also discretionary and were protected by the discretionary function exception even if the employees' particular actions were negligent. Thus, once the Mississippi River Commission decided to construct the Corregidor dikes and the Sarah Island–Opossum Point revetment, the Corps actions were protected even if its actions turned out to be negligent.

It is apparent to the Court that the challenged actions of the Corps involved the exercise of discretion in furtherance of policy goals. The United States is, therefore, shielded from liability by the discretionary function exception.

*Motions for Sanctions and Attorney's Fees*

■ Both the defendants and the plaintiff filed motions for sanctions and attorney's fees pursuant to Rule 11 of the Federal Rules of Civil Procedure. These motions were filed in conjunction with the defendants' original motion for summary judgment. The defendants filed a motion for sanctions and attorney's fees arguing that the plaintiff's Fifth Amendment taking and procedural due process claims were frivolous; that the plaintiff's claim that the exculpatory clause was unenforceable had no basis in law; and that the plaintiff's claim that the flood control immunity provision should not apply was without supporting legal authority. The plaintiff then countered with a motion for sanctions and attorney's fees arguing that the defendants' Rule 11 motion was frivolous and violated Rule 11.

Rule 11 of the Federal Rules of Civil Procedure provides the following:

(b) Representations to Court. By presenting to the court … a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(c) Sanctions. If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may … impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdi-

vision (b) or are responsible for the violation.

Rule 11 is designed to "deter frivolous claims and curb abuses of the legal system, thereby speeding up and reducing the costs of litigation." *Binghamton Masonic Temple, Inc. v. Bares,* 168 F.R.D. 121, 126 (N.D.N.Y.1996). The imposition of Rule 11 sanctions should be approached with caution and should not be imposed so as to "chill creativity or stifle enthusiasm or advocacy." *Binghamton,* 168 F.R.D. at 126. A court must employ a standard of objective reasonableness to determine whether or not a Rule 11 violation has occurred. *Business Guides, Inc. v. Chromatic Communications Enters., Inc.,* 498 U.S. 533, 548, 111 S.Ct. 922, 931–32, 112 L.Ed.2d 1140 (1991). An argument is frivolous and subject to legal sanctions if, under an objective standard of reasonableness, it is clear that no chance of success and no reasonable argument to extend, modify or reverse the law as it stands exists. *Morley v. Ciba–Geigy Corp.,* 66 F.3d 21,25 (2nd Cir. 1995).

The Court, applying a standard of objective reasonableness, does not find that either party's arguments were frivolous so as to subject the opposing party to Rule 11 sanctions. Each party's motion for sanctions and attorney's fees is, therefore, denied.

### CONCLUSION

In conclusion, the Court finds that summary judgment should be granted in favor of the United States. Columbia Gulfs negligence claim against the United States is barred by the exculpatory language of its pipeline permit. In addition, the projects at issue here are flood control projects for which the United States has not waived its sovereign immunity. Finally, the negligence claim is barred by the discretionary function exception of the FTCA and SAA.

In addition, the Court denies each party's motions for sanctions and attorney's fees. All other motions are denied as moot.

An appropriate final judgment shall follow.

IT IS, THEREFORE, ORDERED AND ADJUDGED, that the defendant's motion for summary judgment is hereby granted. It is further,

ORDERED AND ADJUDGED, that the defendants' motion for sanctions and attorney's fees is denied. It is further,

ORDERED AND ADJUDGED, that the plaintiff's motion for sanctions and attorney's fees is denied. It is further,

ORDERED AND ADJUDGED, that all other motions still pending are denied as moot.